743 F.2d 827
 53 USLW 2212
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Edward Eugene SATTERFIELD a/k/a "Pig" Satterfield, Perry Don
Allison, Carlton Welden, Defendants-Appellants,
Cross-Appellees.
In re UNITED STATES of America, Petitioner.
 Nos. 83-7444, 83-7583.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 3, 1984.
 
 Craig Izard, court appointed, Birmingham, Ala., for Satterfield.
 W.M. Beck, Sr., Fort Payne, Ala., Charles Caldwell, Birmingham, Ala., for Allison.
 Michael M. Raulston, Chattanooga, Tenn., for Welden.
 Frank W. Donaldson, U.S. Atty., G. Douglas Jones, Herbert H. Henry, III, Asst. U.S. Attys., Birmingham, Ala., Karen I. Skrivseth, U.S. Dept. of Justice, Washington, D.C., for the U.S.
 Appeals from the United States District Court for the Northern District of Alabama.
 On Petition for Writ of Mandamus to the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and JOHNSON, Circuit Judges, and O'KELLEY*, District Judge.
 KRAVITCH, Circuit Judge:
 
 I. FACTS AND PROCEEDINGS
 
 1
 In this appeal we consider a challenge to the constitutionality of the restitution provisions of the Victim and Witness Protection Act of 1982 (the "VWPA" or "Act"). Appellants Carlton Welden, Edward Eugene Satterfield and Perry Don Allison were convicted by a jury of one count of kidnapping in violation of 18 U.S.C. Sec. 1201(a)(1). The court sentenced Satterfield to life imprisonment, Welden to twenty years and Allison to five years, but refused to order payment to the victim under the VWPA, 18 U.S.C. Secs. 3579 and 3580, declaring those provisions unconstitutional under the fifth, seventh and fourteenth amendments. Appellants challenge their convictions under the kidnapping statute; the Government cross-appeals the district court's refusal to order restitution. The Government also petitioned for a writ of mandamus, which has been carried with the appeal, to compel the district court to comply with the restitution statute. We affirm the convictions of all three appellants, reverse the district court's ruling on the constitutionality of the VWPA, remand to the district court for compliance with the restitution statute, and deny the petition for writ of mandamus in light of our decision on the Government's cross-appeal.[1]
 
 
 2
 At trial, the Government alleged that, in the early morning hours of April 7, 1983, Satterfield, Welden and Allison kidnapped Pauline Callaway from her trailer home in Hooker, Georgia, after killing her boyfriend, and forced her to accompany them to Flat Rock, Alabama. The evidence showed that the events leading to the kidnapping began at 10:00 p.m. on April 6, 1983, when appellant Allison accompanied his friend Dervin Little in Little's wife's 1979 red and maroon Malibu Classic to a graveyard in Georgia. In about ten minutes, they were joined by appellant Welden, who drove up in his automobile and asked to trade cars with Little for the evening. Little departed in Welden's car, while Welden and Allison left in the Malibu. At around 3:00 a.m. the next morning, Pauline Callaway and her boyfriend returned from Callaway's sister's home to their trailer. Callaway went to bed immediately, while her boyfriend remained awake. Shortly thereafter, Satterfield, Welden and Allison arrived at the trailer in the Malibu. Allison, the driver, remained in the car while two masked men, later identified by Callaway as Satterfield and Welden, broke into the trailer, shot and killed the boyfriend, went to the bedroom, and, after removing Callaway's clothes, forced her onto the living room couch. When Callaway was unable to tell Satterfield where money and cocaine were hidden in the trailer, he hit her on the head with a shotgun, causing her to bleed profusely and black out.
 
 
 3
 Callaway awakened in the back seat of the Malibu. She was wearing only her boyfriend's bluejean jacket, and two of her abductors were holding her at gunpoint. During the ride, she heard Satterfield tell her to keep her head down. She also heard Satterfield ask "Carlton" to lean toward him so he could whisper something in his ear. Later in the trip, she heard the one referred to as "Carlton" mention that they had just killed a man. Callaway could not see the driver of the car, but observed that he had blondish-brown curly hair.
 
 
 4
 At one point Satterfield forced Callaway out of the car to perform oral sex, and when she returned she deliberately placed some of the blood from her head on the car's interior. When Satterfield later took off his mask, Callaway could see his face, but because it was dark she could not see it very clearly.
 
 
 5
 At 4:30 or 5:00 a.m., the three men took Callaway to a shack rented by Satterfield, at which time Welden and Allison left. Satterfield dragged Callaway into the unlighted house, threw her on the bed, laid down beside her and passed out. Meanwhile, Welden and Allison went to the home of Patricia Holcomb, Satterfield's girlfriend. Holcomb spoke with Welden on the porch and saw the Malibu in her driveway with a man behind the wheel. Later that day she told an FBI agent that the man was Allison, but at trial she admitted that she was not certain. Welden told Holcomb that Satterfield, whom she knew as "Pig," wanted to see her. Welden left, but returned about an hour later in the Malibu and drove Holcomb to Satterfield's. By this time, Allison was no longer in the car. En route to Satterfield's shack, Welden told Holcomb that he "might be in a little bit of trouble."
 
 
 6
 After Welden let her out in front of Satterfield's house, Holcomb went through the unlocked front door and found Satterfield with Callaway. Holcomb attempted to wake Satterfield, saying "Pig, Pig, wake up." When Callaway realized that Satterfield could not be awakened, she tried to get as good a look at him as possible in the dark room. She then escaped and ran to a neighbor's house to call the police.
 
 
 7
 Around 6:00 a.m. Deputy Sheriff John Moses of DeKalb County, Alabama, received the police call. He arrived at Satterfield's neighbor's house and found Callaway in hysterics, her face covered with blood. When she calmed down, Callaway told him that three men, two of whom were named Pig and Carlton, had killed a man in Georgia, using a shotgun, and had kidnapped her. After verifying the murder with Georgia authorities, Moses and two other deputies went to Satterfield's shack. Without an arrest warrant or search warrant, the men knocked on Satterfield's front door, announced their presence, and, receiving no response, entered the house using a flashlight for illumination. Discovering Satterfield and Holcomb in the bedroom, they promptly arrested Satterfield and, following a brief search of the bedroom, seized a pair of trousers, shotgun shells, a bloodstained pillow and a torn shirt with blood on it. After the deputies took Satterfield and Holcomb to separate patrol cars and determined that the house was empty, they continued to search the shack for nearly ten minutes and found the shotgun underneath the cushions of a sofa in the room adjoining the bedroom. At trial, the Government showed that the bloodstains on the pillow and clothing found in Satterfield's bedroom matched the blood type of Pauline Callaway, as did the bloodstains in the Malibu. The test on blood stains found on the shotgun, however, was inconclusive.
 
 
 8
 Carlton Welden was arrested the following day, April 8, 1983, and three days later, police arrested Perry Don Allison. FBI Agent Land testified that Allison was read his Miranda rights upon arrest, but refused to sign a waiver of rights form. The agent also testified that he engaged in casual conversation with Allison during the ride to the police station, during which Allison stated "that he wanted to make it clear that he was not really a mean man, but that he simply had too many people that got him into trouble."
 
 
 9
 Following return of the guilty verdicts, appellants and their counsel were given copies of their presentence investigative reports, which included information concerning their financial status and a victim impact statement showing that Pauline Callaway had incurred $599 in medical bills. The victim impact statement consisted of an unverified report by the Probation Service based upon information Callaway had supplied, and provided no other evidence of injuries sustained or expenses incurred by Callaway or any other victims of the incident. The district court acknowledged that payment of restitution to Callaway was justified under sections 3579 and 3580 of the VWPA, but refused to order payment of the $599 on grounds that the Act violated the defendants' seventh amendment right to a jury trial, and fifth and fourteenth amendment rights to due process and equal protection of the laws. The court therefore ordered terms of imprisonment without restitution to the victim. In a memorandum opinion, United States v. Welden, 568 F.Supp. 516 (N.D.Ala.1983), the trial court explained its holding that the restitution statute is unconstitutional.
 
 
 10
 The three defendants appealed their convictions under 18 U.S.C. Sec. 1201(a)(1) on several grounds. Satterfield raises four grounds for reversal: (1) the shotgun was seized in violation of his rights under the fourth amendment; (2) he was entitled to a mistrial after the court mistakenly read an unedited version of the indictment that included references to his nickname "Pig"; (3) the introduction of Allison's statement violated his right to confront his accuser under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); and (4) the in-court identification of him by Pauline Callaway should have been excluded because a previous photographic display during which she identified him was overly suggestive. Welden raises six issues: (1) the introduction of Allison's statement violated his rights under Bruton; (2) the Government did not prove that he kidnapped Callaway for "ransom or reward or otherwise" as required by 18 U.S.C. Sec. 1201(a)(1); (3) the evidence was insufficient as a matter of law to identify him as one of the captors; (4) the court erred in its ruling on several objections made by his counsel and the prosecutor; (5) the court erroneously declined to give certain requested jury instructions; and (6) the court erred in its decision to sequester the jury during trial. Allison appeals on two grounds: (1) admission of his statement violated his fifth amendment rights; and (2) the evidence was insufficient as a matter of law to identify him as the driver of the vehicle used in the kidnapping.
 
 
 11
 The Government's cross-appeal and petition for writ of mandamus challenge the district court's refusal to order restitution, urging us to enforce the requirement of sections 3579 and 3580 of the VWPA that the sentencing judge order the defendants to pay restitution for specified personal injury or property losses caused by the crime, or state its reasons for ordering less than full restitution.
 
 
 12
 II. THE VICTIM AND WITNESS PROTECTION ACT OF 1982
 
 
 13
 Congress enacted the VWPA to improve the treatment of victims and witnesses in the federal criminal justice system. The Act is designed to protect witnesses from harassment and threats by the defendant, increase the involvement of victims in the decisions and progress of the case, and restore victims to as whole a position as possible. S.Rep. No. 532, 97th Cong., 2d Sess. 10, reprinted in 1982 U.S.Code Cong. & Ad.News 2515, 2516. One of the stated purposes of the VWPA is "to ensure that the Federal Government does all that is possible within limits of available resources to assist victims and witnesses of crime without infringing on the constitutional rights of the defendant." 18 U.S.C. Sec. 1512 note.
 
 
 14
 Two major features of the Act are implicated in this case: (1) the Act broadens a victim's restitution rights by permitting a sentencing judge to impose restitution in conjunction with any other sentence, 18 U.S.C. Secs. 3579 and 3580; and (2) the Act amends Rule 32 of the Federal Rules of Criminal Procedure to require the preparation of a victim impact statement as part of the presentence investigative report, to assess the effect of the defendant's crime on the victim, Fed.R.Crim.P. 32(c)(2).
 
 
 15
 Restitution has always been one of the options available to a sentencing judge. Prior to the Act, however, restitution could be imposed only as a condition of probation under the Probation Act, 18 U.S.C. Sec. 3651. In the Senate committee report submitted with the VWPA,[2] Congress criticized the courts' limited use of restitution as a condition of probation, finding that federal criminal courts had "reduc[ed] restitution from being an inevitable if not exclusive sanction to being an occasional afterthought." S.Rep. No. 532, 97th Cong., 2d Sess. 30, reprinted in 1982 U.S.Code Cong. & Ad.News 2536. Under the new legislation, restitution may be imposed not only in conjunction with probation, but also in addition to incarceration and/or fine, or even as an independent sentence. As a means of encouraging frequent use of the restitution option, the court is required to state its reasons on the record if it decides not to order full restitution to the crime victim in each case. 18 U.S.C. Sec. 3579(a)(2).
 
 
 16
 The Act amends subsection (c)(2) of Fed.R.Crim.P. 32[3] to require that the presentence investigative report, which is prepared for the court by the Probation Service, include a statement containing information about the financial, social, psychological and medical impact on the victim of the crime, or any other information that may aid the court in ordering restitution. The court will use this victim impact statement to determine the defendant's restitution liability. See S.Rep. No. 532, 97th Cong., 2d Sess. 11-13, reprinted in 1982 U.S.Code Cong. & Ad.News 2517-19.
 
 
 17
 The provisions of the VWPA authorizing restitution awards, Secs. 3579 & 3580, are set forth in their entirety in the margin.[4] Subsection 3579(a)(1) permits the court to order restitution in addition to or in lieu of any other sentence, and, if imprisonment is ordered, restitution may become a condition of subsequent parole or probation. 18 U.S.C. Sec. 3579(a)(1), (g). Subsection 3579(b) enumerates the types of property damage and bodily injury expenses the victim may recover. The court also may order that restitution, including funeral expenses, be paid to the estate of a deceased victim, and, with the consent of the victim or his estate, make restitution payable in services in lieu of money. 18 U.S.C. Sec. 3579(b)(3), (b)(4), (c).
 
 
 18
 Subsection 3580(a) broadly defines the factors the court may consider in ordering restitution. They include the amount of loss sustained by the victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and his dependents, and other factors the court deems appropriate. Subsection 3580(c) directs the court to disclose to the defendant and the Government "all portions" of the victim impact statement prepared by the Probation Service, and subsection 3580(d) specifies that any dispute about the proper amount or type of restitution should be resolved by the court by a preponderance of the evidence. The Government must carry the burden of proof as to the victim's loss, and in mitigation the defendant may demonstrate the extent of his financial resources and needs.
 
 
 19
 According to subsection 3579(h), restitution orders may be enforced in a civil action by the victim or the United States. The Act also reduces the victim's burden of establishing the defendant's liability in a subsequent suit brought for additional damages for pain and suffering, punitive damages or other injuries not covered by the restitution order; subsection 3580(e) states that a defendant convicted of an offense for which restitution has been ordered shall be estopped from denying the essential allegations of that offense in a subsequent federal or state proceeding brought by the victim. To prevent double recovery, subsection 3579(e)(2) provides that an amount paid to a victim as restitution shall be set off against any compensatory damages later recovered in a civil proceeding.
 
 III. CONSTITUTIONALITY OF THE VWPA
 
 20
 The district court declared sections 3579 and 3580 of the Act unconstitutional on their face under the seventh, fifth and fourteenth amendments. We address each in turn.
 
 A. Seventh Amendment
 
 21
 The seventh amendment guarantees the right to a jury trial in suits "at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The district court held that the restitution statute violates this amendment by creating a civil action at common law without giving either the victim or the defendant the opportunity to have the defendant's restitution liability determined by a jury. In so holding, the court was persuaded that the collateral estoppel and civil enforcement provisions of the Act converted an otherwise criminal sentencing hearing into a civil proceeding.[5]
 
 
 22
 The characterization of a penalty as civil or criminal is a question of legislative intent. United States v. Ward, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980). In drafting the restitution provisions of the VWPA, Congress made clear in both the language of the statute and its accompanying legislative history that victim restitution would be imposed as a criminal, rather than civil, penalty. Subsection 3579(a)(1) allows the court to order restitution "in addition to or in lieu of any other penalty authorized by law" as part of the "sentencing" of a defendant. 18 U.S.C. Sec. 3579(a)(1).
 
 
 23
 Consistent with this characterization of restitution as part of a criminal sentence are subsections 3580(a) and (b), which incorporate the restitution order into the traditional sentencing role of the court. Under subsection 3580(a), the court can order restitution only after it considers the financial resources of the defendant, his earning ability and the financial needs of his dependents. These considerations, which help tailor restitution to the individuality of the defendant, are vital to the rehabilitation goals of sentencing,[6] but generally are not relevant in determining the amount of damages awarded in a civil case. Subsection 3580(b) authorizes the court to order its probation service to prepare and submit, as part of its presentence report, information pertaining to the loss of the victim and the financial status of the defendant. Congress' decision to involve the probation service in the development of the facts supporting a restitution order further reveals an intent to treat restitution as one of the options available to the district court in imposing an appropriate sentence.[7]
 
 
 24
 The legislative history of the VWPA reenforces our conclusion that Congress intended to make restitution an element of the criminal sentencing process and not an independent action civil in nature. The history is replete with references to restitution as part of the criminal sentence. See, e.g., S.Rep.No. 532, 97th Cong., 2d Sess. 30, reprinted in 1982 U.S.Code Cong. & Ad.News 2515, 2536 ("restitution ... lost its priority status in the sentencing procedures of our federal courts long ago"); id. at 32, reprinted in 1982 U.S.Code Cong. & Ad.News 2515, 2538 ("permitting its use in conjunction with imprisonment, fine, suspended sentence, or other sentence imposed by the court"); 128 Cong.Rec. H8467 (daily ed. Oct. 1, 1982) (statement of Representative McCollum) ("Restitution would become a sentence that could, in and of itself, be imposed.... This legislation does not intend that restitution become a substitute for civil damages ....").[8] See also United States v. Richard, 738 F.2d 1120 at 1122 (10th Cir.1984) ("order of restitution under sections 3579 and 3580 is a part of the sentencing process").
 
 
 25
 There can be little doubt that Congress intended the restitution penalties of the VWPA to be incorporated into the traditional sentencing structure. Despite this demonstrated legislative intent, however, the district court held that by including a civil enforcement mechanism and a collateral estoppel provision in the statute Congress did not implement its scheme in a constitutional manner and essentially created a hybrid proceeding having sufficient civil action characteristics to trigger the protections of the seventh amendment. We do not agree.
 
 1. Collateral Estoppel
 Subsection 3580(e) of the VWPA provides:
 
 26
 A conviction of a defendant for an offense involving the act giving rise to restitution under this section shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with the State law, brought by the victim.
 
 
 27
 The district court held that a hearing having collateral estoppel effects must be construed as the equivalent of a suit at common law. The court understood section 3580(e) as necessarily giving collateral estoppel effect in subsequent civil actions to all of the facts underlying a restitution order. Were we to follow this interpretation, we might agree that the restitution order has the characteristics of a civil judgment, but we do not read the Act so broadly. The section merely states that a "conviction" of a defendant for an offense giving rise to a restitution order shall estop the defendant from denying "the essential allegations of that offense " in a subsequent civil proceeding. 18 U.S.C. Sec. 3580(e) (emphasis added). The defendant is barred from challenging in a later proceeding only those facts underlying the criminal offense that were necessarily decided by the jury's verdict. The Act's collateral estoppel provision would not apply to those facts supporting the restitution order--e.g., the extent and nature of the victim's injury or the value of damaged property--that were not part of the essential allegations underlying the criminal conviction.
 
 
 28
 Subsection 3580(e) does no more than codify the rule in this and other circuits that a criminal conviction may be used as conclusive proof of some issues in a subsequent civil litigation. See, e.g., Raiford v. Abney, 695 F.2d 521, 523 (11th Cir.1983); United States v. Podell, 572 F.2d 31, 35 (2d Cir.1978). Under this doctrine of collateral estoppel, a party is precluded from litigating an issue only if the identical issue has been actually litigated in a prior suit that could not have been decided without resolving the issue. Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1501-02 (11th Cir.1984). What issues were actually litigated in the criminal proceeding is a factual question that must be determined on a case-by-case basis. Id. at 1502. Subsection 3580(e) does not expand this rule. The facts underlying a criminal offense that gives rise to a restitution order will be given collateral estoppel effect only if they were fully and fairly litigated at the criminal trial, or stipulated through a guilty plea. See Raiford, 695 F.2d at 523 (guilty plea given same collateral estoppel effect as any other criminal convictions; plea of nolo contendere distinguished). The collateral estoppel provision of the VWPA does not contravene congressional intent, convert the restitution aspect of the sentencing hearing into a civil proceeding, or deny the defendant his right to a jury trial under the seventh amendment.
 
 2. Civil Enforcement
 Subsection 3579(h) provides:
 
 29
 An order of restitution may be enforced by United States or a victim named in the order to receive the restitution in the same manner as a judgment in a civil action.
 
 
 30
 The district court did not explain why this procedure for enforcing a restitution order transforms the criminal sentencing hearing into an action at common law. The provision simply makes the civil judgment enforcement mechanism available to the United States or the victim following an order of restitution.
 
 
 31
 In enacting the VWPA, Congress wanted to ensure that victims of crime would be restored to their prior state of well-being. S.Rep. No. 532, 97th Cong., 2d Sess. 30, reprinted in 1982 U.S.Code Cong. & Ad.News 2536. This goal would be accomplished only if victims were assured of recovering the restitution awarded by the court. Aware that restitution awards under the Probation Act, 18 U.S.C. Sec. 3651, were infrequently used and indifferently enforced, Congress enacted subsection 3579(h) to remedy this problem and facilitate the collection process. S.Rep. No. 532, 97th Cong., 2d Sess. 30, reprinted in 1982 U.S.Code Cong. & Ad.News 2536.
 
 
 32
 Civil enforcement of criminal penalties is not a new concept. Section 3565 of Title 18 already gives the United States the right to collect a criminal penalty "by execution against the property of the defendant in like manner as judgments in civil cases." Under both section 3565 and subsection 3579(h), the Government may employ the enforcement procedures of Fed.R.Civ.P. 64 and 69(a) to collect criminal penalties. See United States v. Thornton, 672 F.2d 101 (D.C.Cir.1982); S.Rep. No. 532, 97th Cong., 2d Sess. 33, reprinted in 1982 U.S.Code Cong. & Ad.News 2539. The VWPA merely extends this right to the victims themselves. The inclusion of this civil enforcement provision does not transform the restitution order into an action at common law.[9]
 
 B. Due Process
 
 33
 The district court held that the VWPA did not provide the sentencing judge with sufficiently "ascertainable standards" to comply with the due process requirements of fairness and non-arbitrary exercise of power. In an exhaustive review of the VWPA, the court found fault in the statute's failure to address dozens of potentially troublesome issues such as the standard for admissibility of evidence, the possible applicability of discovery procedures, and the requirements for ensuring adequate notice to the defendant. The possibility that due process violations will occur in particular cases in the future, however, does not render the statute unconstitutional on its face.
 
 
 34
 We agree with the district court's observation that the statute is written in general terms and creates many questions the courts will have to answer.[10] The statute presents unresolved questions affecting the defendant's ability to obtain prior notice of his potential restitution liability and his right to contest the facts supporting that liability before the award is made. Appellants specifically question the adequacy of the procedural safeguards at the sentencing phase,[11] where the Act provides few standards governing the procedures to be used for determining the restitution owing the victim or the ability of the defendant to pay. For instance, the statute does not prohibit the use of hearsay evidence and is silent on the defendant's right, if any, to cross-examine or call his own witnesses.[12]
 
 
 35
 In assessing the effect of these shortcomings of the VWPA on the fifth amendment rights of the defendant, we begin with the basic proposition that due process assures the defendant he will be given adequate notice and an opportunity to contest the facts relied upon to support his criminal penalty. See Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). It is now well settled that the sentencing process as well as the trial itself must satisfy these requirements. See Shelton v. United States, 497 F.2d 156, 159 (5th Cir.1974). The defendant need not, however, be accorded the same degree of due process protections during the sentencing phase as was required at the criminal trial. United States v. Stephens, 699 F.2d 534, 537 (11th Cir.1983). Cf. Proffitt v. Wainwright, 685 F.2d 1227, 1254-55 (11th Cir.1982) (due process protections greater at capital sentencing than at noncapital), mod. on reh'g, 706 F.2d 311 (11th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 508, 78 L.Ed.2d 697 (1984). The sole interest being protected is the right not to be sentenced on the basis of invalid premises or inaccurate information. United States v. Hodges, 556 F.2d 366, 369 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978). Because the sentencing procedure is not a trial, courts have limited this right in order to prevent the sentencing hearing from becoming a full-scale evidentiary hearing. Stephens, 699 F.2d at 537; United States v. Espinoza, 481 F.2d 553 (5th Cir.1973). The degree of protection required is only that which is necessary to ensure that the district court is sufficiently informed to enable it to exercise its sentencing discretion in an enlightened manner. Stephens, 699 F.2d at 537.
 
 
 36
 Although we believe it is possible for a defendant in a particular case to have his right to a fair sentencing hearing violated by the arbitrary imposition of restitution, we conclude that the VWPA, together with the dictates of Rule 32, contains sufficient safeguards to ensure that a sentencing judge, exercising appropriate discretion, will award restitution based on accurate facts and premises. The Act supplies the basic framework for determining the amount of restitution. Subsection 3580(a) provides that before ordering restitution the court must consider the amount of loss sustained by the victims, the financial condition of the defendants, and any other factors the court deems appropriate. The Act places the burden on the Government to prove by a preponderance of the evidence the amount of loss resulting from the offense; the defendant must demonstrate the financial needs of himself and his dependents by the same standard. 18 U.S.C. Sec. 3580(d). Although the only reference to the source of this relevant information is found at subsection 3580(b), which authorizes the court to order the Probation Service to prepare a victim impact statement as part of the presentence report, nothing in the statute prevents the court from hearing testimony or receiving other evidence relevant to its inquiry. Rule 32(a)(1)(C) creates additional procedural protection by assuring the defendant the opportunity "to make a statement in his own behalf and to present any information in mitigation of punishment."
 
 
 37
 Although a noncapital defendant does not have a constitutional right to call and cross-examine witnesses to rebut information contained in the presentence report, United States v. Ashley, 555 F.2d 462, 466 (5th Cir.), cert. denied, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977), Rule 32(c)(3)(A) gives him the right to comment on the report and correct any alleged factual inaccuracies contained in it. The right to rebut information contained in a presentence report also has been expressly recognized in the courts. See United States v. Aguero-Segovia, 622 F.2d 131, 132 (5th Cir.1980). This right is especially important when, as is likely in the context of restitution, a sentencing judge explicitly relies on certain information in setting a sentence. Espinoza, 481 F.2d at 556. The defendant facing restitution is further protected by Rule 32(c)(3)(D), which requires the trial court to make a factual finding on the record if the defendant challenges the accuracy of the information contained in the presentence report and relied upon by the sentencing judge. This rule presumably will apply to the victim impact statement as well. This should facilitate appellate review and help ensure that the sentence will not be based on inaccurate facts. If the rights delineated in Rule 32 are enforced by the sentencing judge, the defendant should be afforded timely notice and an opportunity to respond to the statements made in that report.
 
 
 38
 Addressing the many other concerns of the district court, we conclude only that the VWPA and Rule 32 provide a sentencing judge with the basic tools necessary to award restitution constituting fair compensation to the victim while protecting the rights of the defendant. Congress wisely has determined that the court should be provided "some flexibility in determining the kind of restitution which would both satisfy the victim and provide maximum rehabilitative incentives to the offender." S.Rep. No. 532, 97th Cong., 2d Sess. 32, reprinted in 1982 U.S.Code Cong. & Ad.News 2538. The sentencing judge should be given wide discretion to individualize the sentence to suit the defendant's character, social history, and other peculiarities of the case,[13] and the statute was drafted without unduly inhibiting that freedom. The guidelines provided in the VWPA are more extensive and specific than any appearing in the restitution provision of the Probation Act,[14] which judges have been applying for years. As with any newly-enacted legislation, the courts will have to resolve many questions of interpretation, some of which have been foreshadowed by the district court in this case; but this lack of precision does not render the statute constitutionally deficient under the due process clause.
 
 C. Equal Protection
 
 39
 The district court also declared the restitution provisions of the VWPA unconstitutional under the equal protection clause of the fourteenth amendment. In the course of its discussion of various constitutional principles, the court raised two concerns that could be characterized as implicating the guarantee that no individual shall be denied equal protection of the laws. Neither of these concerns supports the court's conclusion that the statute is unconstitutional on its face.
 
 
 40
 The court first held that the lack of ascertainable standards in the Act would result in such widely disparate sentences imposed by the various district courts that offenders necessarily would not be treated equally. Even if the court's premise is correct, disparate treatment of similarly situated individuals at sentencing is not constitutionally impermissible. The Supreme Court has recognized that the "Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences." Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970). A sentencing authority must be given wide latitude in fixing the punishment for convicted offenders. The VWPA encourages individualized sentencing by directing the court to fix a restitution award based on the particular injuries inflicted on the victim and the financial needs of the defendant and his family. 18 U.S.C. Sec. 3580(a). When this discretion is carefully exercised, disparate results must be expected. The likelihood of disparate awards provides no basis for invalidating the statute.
 
 
 41
 The second equal protection issue raised below requires a construction of subsection 3579(g), which provides:
 
 
 42
 If such defendant is placed on probation or parole under this title, any restitution ordered under this section shall be a condition of such probation or parole. The court may revoke probation and the Parole Commission may revoke parole if the defendant fails to comply with such order. In determining whether to revoke probation or parole, the court or Parole Commission shall consider the defendant's employment status, earning ability, financial resources, the willfulness of the defendant's failure to pay, and any other special circumstances that may have a bearing on the defendant's ability to pay.
 
 
 43
 This provision authorizes revocation of parole or probation if the defendant fails to comply with the restitution order. The only conditions the revoking body is required to consider are the defendant's willfulness in failing to satisfy the order, his financial ability to pay and any other circumstances that might affect his ability to comply. The question arises whether this subsection must be held unconstitutional in light of the Supreme Court's decision in Bearden v. Georgia, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). In Bearden, which was decided after the enactment of the VWPA but which concerned revocation of probation for failure to pay a fine and restitution ordered by a state court, the Court held that if a probationer has made all reasonable efforts to pay the fine or restitution, yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically "without considering whether alternative methods of punishing the defendant are available."[15] Id. 461 U.S. at ----, 103 S.Ct. at 2071. Because subsection 3579(g) automatically makes a restitution award a condition of probation or parole, this principle of fairness should also apply to revocation of probation or parole following the defendant's failure to pay restitution awarded under the VWPA.
 
 
 44
 Bearden creates two threshold criteria a court must consider in revocation proceedings: whether the defendant has made a bona fide effort to pay; and, if he has done so and still cannot comply, whether alternative measures of punishment are available. Id. 461 U.S. at ----, 103 S.Ct. at 2073. Section 3579(g) incorporates the first consideration, but not the second. The court or the Parole Commission, under a strict application of subsection 3579(g), could revoke the probation or parole of an indigent who is making good faith efforts to pay his VWPA restitution liability, without considering means of punishment, other than imprisonment, that would satisfy the penalogical interests of the Government. According to Bearden, revocation imposed under such circumstances would be unconstitutional.
 
 
 45
 The absence of an express requirement in subsection 3579(g) that revocation cannot occur unless alternative punishments are considered does not render the statute unconstitutional on its face, however, because the provision can, and should, be construed in a constitutional manner. See International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961) (federal statutes are to be construed as to avoid serious doubt of their constitutionality). This section provides only that the court or Parole Commission "may" revoke probation or parole if the defendant does not make restitution, and that the revocation proceeding must take into account the defendant's financial ability and willingness to pay. It does not preclude the revoking body from considering any other factors deemed relevant or constitutionally required. Under the Act, the court or Parole Commission may, and under Bearden must, consider alternative means of punishment before revoking probation or parole upon the defendant's failure, despite good-faith efforts, to pay restitution to the victim.
 
 
 46
 Because the statute can be applied in a constitutional manner, we reverse the district court's conclusion that it is unconstitutional on its face and remand for further proceedings.
 
 IV. ADMISSIBILITY OF SHOTGUN
 
 47
 Appellant Satterfield contends that the trial court erred in overruling his motion to suppress the shotgun seized from his residence at the time of his arrest. Deputy Sheriff John Moses testified that when he spoke with Callaway at 6:45 a.m., in the house next door to Satterfield's, she told him that she had witnessed a murder, that the killers had used a shotgun, that a man named Pig was next door with a woman, and that another man named Carlton, who had participated in the murder and kidnapping, was no longer there. After verifying the homicide with the sheriff's department, Moses called for assistance. Approximately thirty minutes later, he and two backup officers walked over to appellant's house, announced their presence and, receiving no response, entered the home using a flashlight for illumination. Moses testified that they had obtained neither an arrest warrant nor a search warrant because a warrant probably could not have been acquired for several hours, during which time the occupants might have escaped. The officers moved through the living room, found Satterfield in bed with his girlfriend, Patricia Holcomb, and immediately arrested him.
 
 
 48
 Once inside the bedroom, the officers seized Satterfield's trousers, shotgun shells in the pockets, a bloodstained pillow and a torn shirt. When a brief search failed to locate the shotgun in the bedroom, Satterfield and Holcomb were taken outside and placed in separate patrol cars. After the police had ascertained that there was no one else in the house, the search of Satterfield's residence continued, and approximately ten minutes later the shotgun was discovered underneath the cushions of a sofa in a room adjoining the bedroom.
 
 A. The Exigent Circumstances Exception
 
 49
 Although a warrantless search and seizure in a home is presumed to be unreasonable, Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), courts will uphold searches of homes based on both probable cause and exigent circumstances. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The existence of probable cause is not disputed. Callaway's statement that a shotgun was used in the murder, coupled with the discovery of bloodstained items in Satterfield's house, was sufficient for a reasonably cautious officer to believe that the shotgun was in the building. See United States v. Rojas, 671 F.2d 159, 165 (5th Cir. Unit B 1982). The presence of exigent circumstances, however, is not as obvious. The Government maintains that an immediate search for the shotgun was justified because the officers knew at least one other suspect was still at large and could return to Satterfield's home at any moment to retrieve the weapon, thus presenting a danger to their safety and the welfare of the community. Because only three policemen were present at the scene, two of whom were needed to transport appellant and Holcomb to the station, the Government asserts that it would have been difficult and dangerous for the remaining officer to secure the house against the other suspect for a period of several hours while a search warrant was being issued.
 
 
 50
 The exigent circumstances exception to the warrant requirement encompasses a variety of common situations, including hot pursuit of a suspect, United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-2410, 49 L.Ed.2d 300 (1976); mobility of a vehicle, Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); risk of removal or destruction of evidence, United States v. Rubin, 474 F.2d 262 (3d Cir.), cert. denied, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); and danger to arresting officers or the public, Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Invoking the Hayden exception, as construed in United States v. Burgos, 720 F.2d 1520 (11th Cir.1983), and United States v. Quigley, 631 F.2d 415 (5th Cir.1980), the Government contends that an immediate search of Satterfield's house was justified because the delay involved in obtaining a warrant would have endangered the police or the public. We disagree.
 
 
 51
 The exigent circumstances doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action. Burgos, 720 F.2d at 1526. In Hayden, the seizures occurred as part of an effort to find a suspected felon believed to be armed within a house into which he had run only minutes before police arrived. The officers gained entry to the home by permission of the suspect's mother and began searching the various rooms for the suspect and any weapons that might pose a danger to them. Simultaneously with the time the suspect was discovered and apprehended in an upstairs room, officers in other rooms were uncovering and seizing evidence later used at trial. The Court held that the search of the entire house was "reasonably necessary to prevent the dangers that the suspect at large ... may resist or escape." 387 U.S. at 299, 87 S.Ct. at 1646. Quigley presented a similar situation. Pursuing an escaped felon, the police discovered the suspect in a motel room with his girlfriend and immediately placed him in handcuffs. Within forty-five seconds after the arrest, one of the officers found a pistol beneath the bed sheets. The former Fifth Circuit held the search was justified as a "cursory safety check" because the suspect was reasonably believed to be armed when he entered the motel room, and the girl in the room with him, who was unrestrained at the time, was reasonably believed to be his accomplice and could have gained access to any concealed weapons. 631 F.2d at 419.
 
 
 52
 Hayden and Quigley are distinguishable on two significant points. In both cases the police made the searches and seizures simultaneously with, or within seconds after, the defendants' arrest, whereas Satterfield and his girlfriend were taken into custody approximately ten minutes before the shotgun was found. More important, at the time of the searches in Hayden and Quigley, the police had reason to believe that dangerous weapons were accessible to the suspect or an accomplice who was present, or may have been present, in the building. In the instant case, Satterfield and Holcomb were restrained in patrol cars while the house was being searched; neither could possibly have posed a threat to the arresting officers. Moreover, the officers had already determined that no one else was present in the building. Under these circumstances, the search for the shotgun was not justified by exigency.
 
 
 53
 Burgos is distinguishable on similar grounds. Government agents in that case observed a man purchase two crates of firearms from two gun shops and transfer them to the trunk of Burgos' automobile. Burgos drove to his residence with the surveillance team following him. Together with another man, he then took the crates, which contained 45 guns, out of his trunk and into his house. As Burgos was exiting his home, three or four agents stopped him on the front porch, entered the house and seized the firearms. In upholding the seizure as lawful, the court found two critical facts creating exigent circumstances: (1) the agents were faced with a house "laden with arms and an unknown number of people inside," thus presenting an immediate threat to the security of the entire neighborhood, and (2) they had reason to believe the house contained dangerous third persons who might pose a threat to their safety. 720 F.2d at 1526. Neither of these circumstances is present here. The police had no reason to believe that Satterfield's residence contained more than one firearm, and they knew that the only occupants of the house were already in police custody outside.
 
 
 54
 An arrest within a home does not provide a license for the police to search the entire residence for evidence. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); United States v. Cueto, 611 F.2d 1056, 1062 (5th Cir.1980). The test is whether the officers reasonably could have perceived that delay would endanger their lives or the lives of others. Hayden, 387 U.S. at 298-99, 87 S.Ct. at 1645-46. Under the facts presented here, it is clear that no immediate threat existed. The only potential danger emanated from Satterfield's unknown accomplices, who might have returned to the house to claim the shotgun without the knowledge of the police. Protection against this remote eventuality is not the type of circumstance that creates an urgent need for immediate action. If three officers were inadequate to transport the suspects to the station and also stand guard at Satterfield's house until a warrant was obtained, the police could have summoned additional support. See Segura v. United States, --- U.S. ----, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984) (police may conduct perimeter stakeout of home to prevent persons from obtaining evidence while search warrant is being issued). An immediate search of the house after all of the occupants had been taken into custody and removed from the building was not reasonably necessary to ensure the safety of the police officers or the area residents. We therefore hold that the search for the shotgun was not justified under the exigent circumstances exception to the warrant requirement.
 
 B. The Inevitable Discovery Exception
 
 55
 Under the exclusionary rule, the illegally seized shotgun would not have been admissible in evidence against Satterfield unless an exception to the rule applied. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Government asserts that the weapon was properly admitted under the "inevitable discovery" exception, recognized by this circuit in United States v. Roper, 681 F.2d 1354 (11th Cir.1982), and recently adopted by the Supreme Court in Nix v. Williams, --- U.S. ----, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The Government maintains that the shotgun would have been found in any event because the police obtained a valid warrant for the search of Satterfield's residence several hours after the illegal search was made. The warrant issued for the search of "bloodstained sheets and clothing" and asserted probable cause based upon information supplied by Callaway that she saw the bloodstained items in the home on the previous night. Because the police might reasonably have expected that bloodstained clothing could be hidden under the sofa cushions where the gun was found, the Government asserts that the police undoubtedly would have uncovered the weapon during their search with the warrant.
 
 
 56
 The Supreme Court briefly explained the inevitable discovery doctrine in Nix:
 
 
 57
 If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received.
 
 
 58
 Id. at ----, 104 S.Ct. at 2509. In Nix, the suspect was subjected to an illegal interrogation during which he directed the police to the location of the murder victim. At the time the confession was being elicited, a wide-spread search party had closed to within two and one-half miles of the site on which the body was found. Applying a preponderance of the evidence standard, the Court held that the uncovered remains were properly admitted into evidence because the record indicated that the search party was methodically progressing to the location of the body and inevitably would have found the evidence within three or four hours. The Court stated without much elaboration that if the information "ultimately or inevitably would have been discovered by lawful means" the exclusionary rule should not be applied. Id.
 
 
 59
 Except for the application of its rule to the specific facts before the Court and its holding that the Government must establish the inevitability of discovery by a preponderance of the evidence, the Supreme Court was silent as to what constitutes an "inevitable" discovery under the doctrine. Because the Nix decision is consistent with the previous case law of this circuit, we look to our earlier decisions for guidance in determining whether the facts of this case come within the exception.
 
 
 60
 The elements of the inevitable discovery rule in this circuit were set forth in a former Fifth Circuit case, United States v. Brookins, 614 F.2d 1037 (5th Cir.1980). To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct. Id. at 1042 n. 2, 1048. See also Roper, 681 F.2d at 1358. Because the second element is not satisfied here, we hold that the shotgun was not admissible under the inevitable discovery exception.
 
 
 61
 In Brookins, the police obtained the identity of a key prosecution witness through the illegal interrogation of the defendant. The court held the witness' testimony admissible because lawful police inquiries that were already "set in motion" probably would have disclosed the witness' identity. 614 F.2d at 1048. In Roper, police arrested the defendant in the hall outside his motel room and, seconds later, seized a gun from a briefcase on the dresser inside the room after learning its location from a brief interrogation in violation of his Miranda rights. The court held that the gun was admissible because the police had the right to search the room immediately[16] and were about to perform that lawful search when the illegal inquiry revealed the location of the gun. 681 F.2d at 1358.
 
 
 62
 Operation of the exclusionary rule when the police probably would have discovered the evidence through pursuit of a legal right they already possessed and were actively pursuing would place the Government in a worse position than before the illegal conduct occurred. The Supreme Court condemned this result as contrary to the public interest. See Nix, 104 S.Ct. at 2509. Here the Government had not yet initiated the lawful means that would have led to the discovery of the evidence. Unlike both Brookins and Roper, at the time the Government violated Satterfield's fourth amendment right, it did not possess the legal means that would have led to the discovery of the shotgun. That means did not exist until several hours later when the warrant was obtained.
 
 
 63
 Under Brookins and Roper, if evidence is obtained by illegal conduct, the illegality can be cured only if the police possessed and were pursuing a lawful means of discovery at the time the illegality occurred. See also United States v. Parker, 722 F.2d 179, 185 n. 4 (5th Cir.1983); United States v. Shaw, 701 F.2d 367, 379 n. 6 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). The Government cannot later initiate a lawful avenue of obtaining the evidence and then claim that it should be admitted because its discovery was inevitable. This is a sound rule, especially when applied to a case in which a search warrant was constitutionally required. Because a valid search warrant nearly always can be obtained after the search has occurred, a contrary holding would practically destroy the requirement that a warrant for the search of a home be obtained before the search takes place. Our constitutionally-mandated preference for substituting the judgment of a detached and neutral magistrate for that of a searching officer, United States v. Martinez-Fuerte, 428 U.S. 543, 568, 96 S.Ct. 3074, 3087, 49 L.Ed.2d 1116 (1976), would be greatly undermined.
 
 
 64
 The Supreme Court's recent pronouncement in Nix does not affect this result. In adopting its general statement of the inevitable discovery rule, the Court was not presented with a situation in which the lawful means leading to an "inevitable" discovery had not yet been acquired by the police at the time the illegal evidence was seized. The search party there was well on its way to uncovering the body when the suspect revealed its precise location. Thus Nix is not inconsistent with the rule in this circuit that the police must possess and be actively pursuing the lawful avenue of discovery when the illegality occurred.
 
 C. Harmless Error
 
 65
 Having concluded that the shotgun was seized in violation of Satterfield's fourth amendment rights and should have been excluded from the evidence presented at his trial, we must determine whether this error warrants reversal of his conviction of kidnapping under 18 U.S.C. Sec. 1201(a)(1). The Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), held that a conviction need not be reversed if the constitutional error was harmless. The purpose of the harmless error rule is to avoid "setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result." Id. at 22, 87 S.Ct. at 827. This is precisely such a case.
 
 
 66
 The evidence supporting Satterfield's conviction was overwhelming. The victim positively identified him as the man who forced her out of the bedroom of her trailer, as one of two men who killed her boyfriend immediately prior to the abduction, as the man who hit her over the head, as one of the men who held her at gunpoint during the ride to his residence, as the man who forced her to perform oral sex, and as the man who pushed her onto his bed. Satterfield's girlfriend, Patricia Holcomb, verified that Callaway was present in Satterfield's house just prior to the time Callaway called the police from the neighboring residence. In addition, while Callaway was being kept in Satterfield's house, Callaway heard Holcomb refer to him by his nickname "Pig." Substantial physical evidence, including items of clothing and a pillow from his bed, all stained with blood matching the victim's, was found in his shack within minutes after the victim's escape; and shotgun shells matching the type found in his trousers pockets were discovered at the trailer where Callaway's boyfriend was murdered. Compared to all of the other evidence against Satterfield, the shotgun, although further evidence of his complicity in the crime, was not an important item of proof in the Government's case. From our review of the record, we are convinced that the evidence against Satterfield was so extensive that the erroneous admission of the shotgun was harmless beyond reasonable doubt.
 
 V. UNEDITED INDICTMENT
 
 67
 Appellant Satterfield contends that the district court should have granted a mistrial because it read to the jury venire an unedited indictment despite the magistrate's granting of Satterfield's motion to strike references to his nickname "Pig." Satterfield filed a pretrial motion to strike the alias language "also known as 'Pig' Satterfield," which appeared three times in the indictment. The motion was made on grounds that the language was "surplusage in that all witnesses will identify said defendant under the one name of Edward Eugene 'Eddie' Satterfield," and that the alias was immaterial, irrelevant and prejudicial. Following an unrecorded hearing, the magistrate granted the motion.
 
 
 68
 After the prospective jurors were sworn, the court mistakenly read the original, unedited version of the indictment without deleting the three references to Satterfield's nickname. Satterfield's counsel did not object until the judge had finished reading the indictment, at which time he informed the court that the magistrate had deleted the references. He then moved for a mistrial, arguing that the venire would be prejudiced by the negative connotations associated with the name "Pig."
 
 
 69
 Following a period of discussion with Satterfield's counsel and the prosecutor, the court denied the motion for a mistrial and, without again mentioning "Pig," instructed the jury that the alias had previously been ordered stricken from the indictment and that they should disregard it. At the same time, the judge asked the veniremen whether anyone felt he or she would be influenced in any degree by the reference to a nickname of one of the defendants. All responded in the negative. Before opening statements, the court read the edited indictment to the empaneled jury, making no mention of the alias or the previous incident.
 
 
 70
 The decision to grant a mistrial lies within the sound discretion of the trial judge since he is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury. United States v. Hill, 500 F.2d 733, 739-40 (5th Cir.1974), cert. denied, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975). We agree with the district court that the prejudice to Satterfield resulting from the mistaken reading of the unedited indictment was minimal. It is permissible to include an alias in an indictment if the Government plans to introduce evidence of the alias as an identifying characteristic of the defendant. United States v. Haydel, 649 F.2d 1152, 1156 n. 6 (5th Cir.1981). In response to appellant's motion for a mistrial, the prosecutor informed the court that he intended to present witnesses identifying Satterfield as "Pig," and in his opening statement he conveyed a similar intention to the jury. Indeed, during the course of the trial, at least six witnesses, including two defense witnesses, either verified Satterfield's nickname or stated that one of the kidnappers had been called "Pig" during the perpetration of the crime. Because the Government's evidence established that Satterfield and one of the abductors were referred to as "Pig," the nickname was material, and the magistrate need not have ordered its deletion in the first place. Although it was error to read the unedited version because the magistrate had deleted the words, the prejudice resulting therefrom was insignificant in light of the multiple references to Satterfield as "Pig" throughout the course of the trial.
 
 
 71
 The slight prejudice that may have resulted from reading the stricken words was adequately remedied by the district court's cautionary instruction to the jury and reading of the corrected version before opening statements. When an indictment improperly includes a reference to an alias, an appropriate jury instruction can cure possible prejudice. Doelle v. United States, 309 F.2d 396 (5th Cir.1962). Shortly after the error, the district court instructed the jury that it should disregard any reference to an alias made during the court's reading of the indictment. During the cautionary instruction, the court was careful not to mention the name again and asked the veniremen whether they would be influenced in any way by their knowledge that one of the defendants had been known by a nickname. Under these circumstances, the district court did not abuse its discretion in refusing to grant a mistrial.
 
 VI. ADMISSIBILITY OF REDACTED STATEMENT
 
 72
 Appellants challenge the admission of testimony by FBI Agent Land relating a statement made by Allison to Land while en route to the police station. Allison contends that the statement was taken in violation of his Miranda rights; Satterfield and Welden maintain that Allison's statement inculpated them and denied them their right of confrontation, in violation of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Neither claim has merit.
 
 
 73
 During a mid-trial hearing on the admissibility of the statement, Land stated that he advised Allison of his Miranda rights immediately after his arrest. At the same time, he gave Allison an Advice of Rights form, which Allison read. The form repeated the Miranda warnings and also included a waiver of rights provision, which Allison did not sign. According to Land, during the ride to the county police station, Land and Allison engaged in "small talk" or "casual conversation" about topics such as sports, a summer concert and DeKalb County. In the course of the conversation, Allison told Land "that he wanted to make it clear that he was really not a mean person, but that he simply had too many friends that got him into trouble and some of them were not good friends." He also said that "Pig Satterfield and Carlton Welden were mean when they got high." After Allison made this statement, Land immediately readvised him of his Miranda rights. Land told the court at the hearing that neither he nor another FBI agent who was also in the car discussed the case or questioned Allison about the events that led to his arrest.
 
 
 74
 At the end of the hearing, the court found that Allison had initiated the conversation and had volunteered the statement. To avoid any Bruton problems, however, the court redacted the statement so that at trial Land testified only that "Mr. Allison advised me that he wanted to make it clear that he was not really a mean man, but that he simply had too many people that got him into trouble." At the conclusion of Land's trial testimony, the court instructed the jury that any statements allegedly made by Allison were not to be considered in the Government's case against the other two defendants.
 
 
 75
 From a review of the evidence presented to the trial court at the hearing, we conclude that the court did not err in admitting the statement against Allison. Volunteered statements are not barred by the fifth amendment. Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966); United States v. Castro, 723 F.2d 1527, 1530 (11th Cir.1984). FBI Agent Land's testimony indicates that Allison's statement was volunteered. Incriminating statements made in the course of casual conversation are not products of a custodial interrogation. See United States v. Menichino, 497 F.2d 935 (5th Cir.1974).
 
 
 76
 As to appellants Satterfield and Welden, a defendant's right to confront his accuser is infringed by the admissibility of a statement against his codefendant only if the out-of-court statement directly implicates him. United States v. Stewart, 579 F.2d 356, 359 (5th Cir.1978), cert. denied, 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1979). For Bruton to apply, a codefendant's statement must be clearly inculpatory standing alone. United States v. Slocum, 695 F.2d 650, 655 (2d Cir.1982), cert. denied, 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983). Allison's statement that he "had too many people that got him into trouble" did not specifically name Satterfield or Welden, or describe them in such a way that a jury would identify them as among the "people" Allison was referring to. The out-of-court statement falls far short of directly implicating either Satterfield or Welden in the crime. The trial court redacted any references that might have implicated the other defendants, going so far as changing the word "friends" to the more general "people." As an added precaution, the court's cautionary instruction made clear that the statement was admissible only against defendant Allison. Under these circumstances, the Bruton claims of Satterfield and Welden must fail.
 
 VII. APPLICABILITY OF THE KIDNAP STATUTE
 
 77
 18 U.S.C. Sec. 1201 requires that a kidnapping be "for ransom or reward or otherwise." Appellant Welden claims that the statute does not apply to the Government's case against him. In Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522 (1936), the Supreme Court held that Congress enacted the kidnapping statute to prevent the transportation in interstate commerce of persons who were unlawfully restrained for the purpose of the captor's securing "some benefit" to himself. Id. at 128, 56 S.Ct. at 397. The court examined the legislative history of the statute and noted that two years after its initial enactment Congress added the words "or otherwise" for the express purpose of extending the Act to "persons who have been kidnapped and held, not only for reward, but for any other reason ...." Id. (quoting H.Rep. No. 1457, 73rd Cong.2d Sess.).
 
 
 78
 The statute broadly prohibits the interstate transportation of a person against his will if the captor hopes to obtain any benefit to himself from the abduction. The evidence supports the district court's conclusion that Welden participated in the kidnapping to attain some benefit to himself. Callaway had just witnessed the murder of her boyfriend and therefore was a potential witness against the killers. Taking a person away from her home for the purpose of silencing her as a potential witness comes within the "or otherwise" proviso of the kidnapping statute. Hence Welden's claim must fail.
 
 
 79
 VIII. SUFFICIENCY OF THE EVIDENCE AGAINST WELDEN AND ALLISON
 
 
 80
 Appellants Welden and Allison challenge the sufficiency of the evidence to convict them under 18 U.S.C. Sec. 1201(a)(1). To obtain a conviction under the federal kidnapping statute, the Government must prove (1) knowing and willful kidnapping, (2) an intent to gain a benefit from the seizure, and (3) transportation of the victim in interstate or foreign commerce. Hattaway v. United States, 399 F.2d 431, 433 (5th Cir.1968). Appellants do not contest the sufficiency of the Government's evidence proving that a group of men entered the trailer occupied by Pauline Callaway and transported her over the Georgia/Alabama border against her will. Their contention at trial and on appeal is that the evidence was not sufficient to identify them as two of those men.
 
 
 81
 Our review of the evidence is limited to determining whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. United States v. Bell, 678 F.2d 547 (5th Cir. Unit B 1982) (en banc), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In our respect for the jury's verdict, we must view the evidence in the light most favorable to the Government, and we must allow the jury to choose among reasonable constructions of the evidence. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); Bell, 678 F.2d at 549. Applying these standards, we conclude that the evidence was sufficient to allow a reasonable jury to find that Welden and Allison participated in the abduction of Pauline Callaway.
 
 A. Welden
 
 82
 Pauline Callaway testified that two men wearing masks broke into her trailer in Hooker, Georgia, at around 3:00 a.m. on April 7, shot and killed her boyfriend, and forced her out of her home and into a red and maroon Chevrolet Malibu, which police later found with bloodstains matching Callaway's in the interior. En route to their destination in Alabama, she observed three men inside the car; the two who had removed her from the trailer held her at gunpoint while the third drove. During the ride she heard the two gunmen speak to each other, one calling the other "Carlton," Welden's first name. She also noticed the length of her abductors' hair and heard the one named Carlton speak to the others. Having seen and heard appellant Welden on previous occasions speaking with her boyfriend at a local bar, she recognized the voice and hair as Welden's. Based upon her recognition of the hair, name and voice, she positively identified Welden at trial. Dervin Little testified that he loaned the vehicle eventually used in the incident, the Chevrolet Malibu, to Welden at 10:00 p.m. on April 6, approximately five hours before the kidnapping. Patricia Holcomb testified that Welden stopped by her house in the same car at around 5:00 a.m., only two hours after the crime. She also testified that about an hour later, he returned to drive her over to appellant Satterfield's house where Callaway was being held. During the ride, Welden told Holcomb, "We might be in a little trouble." Based upon this direct and circumstantial evidence, a jury could very well have concluded beyond a reasonable doubt that Welden was guilty of kidnapping Pauline Callaway.
 
 B. Allison
 
 83
 The Government's theory of the case placed Allison as the driver of the getaway vehicle. Dervin Little testified that he and Allison were parked in the Malibu at a graveyard on the night of the incident. When Welden switched cars with him in the graveyard at 10:00 p.m., Allison left with Welden in the Malibu. Defense witness Wayne McCarson testified that he saw Allison sitting in the Malibu in Welden's driveway at 11:00 p.m. that same evening. The car was discovered the following morning parked at the State Line Garage, an auto repair shop operated by Allison.
 
 
 84
 Patricia Holcomb testified that when Welden visited her at about 5:00 a.m. on April 7, she saw a man sitting in the driver's seat of Little's car. Although at trial she could not positively identify the man as Allison, she did testify that she told FBI Agent Land the man was Allison when he interviewed her on the afternoon of April 7. After he was arrested on April 11, Allison told the FBI agent that "he wanted to make it clear that he was not really a mean man, but he simply had too many people that got him into trouble."
 
 
 85
 In addition to this circumstantial evidence, the Government's case was strengthened by the weakness of Allison's alibi. Three witnesses testified that they were with Allison at Wayne McCarson's house drinking beer on the night of the kidnapping from 12:30 a.m. until 5:00 a.m. One of the witnesses, McCarson, gave inconsistent versions of where he picked up Allison to bring him to his house for the party. He first testified that he met Allison at Welden's house and later indicated that they met at a liquor store. The other two witnesses related events that the jury may have considered implausible. Witnesses Baker and Posey testified that Posey picked up Baker and one other person at their homes at around midnight for the purpose of driving around the area drinking beer. When they drove by McCarson's house at 12:30 a.m. and saw the lights on, they decided to drop in, joining Allison and McCarson until the early morning hours.
 
 
 86
 There was no direct evidence incriminating Allison in the crime. Unlike Welden, Allison was not positively identified by Callaway as one of her abductors. She did testify, however, that the driver of the car had blondish-brown curly hair, a description that is not inconsistent with Allison's appearance. Although each piece of circumstantial evidence, standing alone, would not have been enough to convict Allison, the totality of the evidence against him was sufficient to persuade a jury that he was guilty beyond a reasonable doubt. The jury reasonably could have disbelieved the testimony of his alibi witnesses, and the circumstantial evidence was sufficient to raise a reasonable inference that Allison was involved in the crime.
 
 IX. OTHER CLAIMS
 
 87
 Appellants raise additional claims, including the admissibility of Callaway's in-court and out-of-court identifications, the district court's ruling on numerous objections made by counsel for appellants and the prosecutor, the court's refusal to give certain jury instructions and its decision to sequester the jury. After reviewing the claims and the record, we find them all to be without merit.
 
 
 88
 Case number 83-7444 is AFFIRMED in part, REVERSED in part, and REMANDED. The Government's petition for writ of mandamus, case number 83-7583, is DENIED.
 
 
 
 *
 Honorable William C. O'Kelley, U.S. District Judge for the Northern District of Georgia, sitting by designation
 
 
 [1]
 Mandamus is appropriate only in "extraordinary cases" to remedy a "clear usurpation of power or abuse of discretion," In re Extradition of Ghandtchi, 697 F.2d 1037, 1038 (11th Cir.1983), and is available only when there is no other adequate means to obtain relief, In re Oswalt, 607 F.2d 645, 648 (5th Cir.1979). Because we grant the Government's cross-appeal and remand to the district court to comply with the restitution provisions of the VWPA, infra, resort to the mandamus procedure is unnecessary
 
 
 [2]
 No House report was submitted with the legislation
 
 
 [3]
 Fed.R.Crim.P. 32(c)(2) as amended, provides:
 The presentence report shall contain--
 (A) any prior criminal record of the defendant;
 (B) a statement of the circumstances of the commission of the offense and circumstances affecting the defendant's behavior;
 (C) information concerning any harm, including financial, social, psychological, and physical harm, done to or loss suffered by any victim of the offense; and
 (D) any other information that may aid the court in sentencing, including the restitution needs of any victim of the offense.
 
 
 [4]
 18 U.S.C. Sec. 3579 provides:
 (a)(1) The court, when sentencing a defendant convicted of an offense under this title or under subsection (h), (i), (j), or (n) of section 902 of the Federal Aviation Act of 1958 (49 U.S.C. 1472), may order, in addition to or in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of the offense.
 (2) If the court does not order restitution, or orders only partial restitution, under this section, the court shall state on the record the reasons therefor.
 (b) The order may require that such defendant--
 (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--
 (A) return the property to the owner of the property or someone designated by the owner; or
 (B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of--
 (i) the value of the property on the date of the damage, loss, or destruction, or
 (ii) the value of the property on the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned;
 (2) in the case of an offense resulting in bodily injury to a victim--
 (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
 (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and
 (C) reimburse the victim for income lost by such victim as a result of such offense;
 (3) in the case of an offense resulting in bodily injury also results in the death of a victim, pay an amount equal to the cost of necessary funeral and related services; and
 (4) in any case, if the victim (or if the victim is deceased, the victim's estate) consents, make restitution in services in lieu of money, or make restitution to a person or organization designated by the victim or the estate.
 (c) If the Court decides to order restitution under this section, the court shall, if the victim is deceased, order that the restitution be made to the victim's estate.
 (d) The court shall impose an order of restitution to the extent that such order is as fair as possible to the victim and the imposition of such order will not unduly complicate or prolong the sentencing process.
 (e)(1) The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation, except that the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation. An order of restitution shall require that all restitution to victims under such order be made before any restitution to any other person under such order is made.
 (2) Any amount paid to a victim under an order of restitution shall be set off against any amount later recovered as compensatory damages by such victim in--
 (A) any Federal civil proceeding; and
 (B) any State civil proceeding, to the extent provided by the law of that State.
 (f)(1) The court may require that such defendant make restitution under this section within a specified period or in specified installments.
 (2) The end of such period or the last such installment shall not be later than--
 (A) the end of the period of probation, if probation is ordered;
 (B) five years after the end of the term of imprisonment imposed, if the court does not order probation; and
 (C) five years after the date of sentencing in any other case.
 (3) If not otherwise provided by the court under this subsection, restitution shall be made immediately.
 (g) If such defendant is placed on probation or paroled under this title, any restitution ordered under this section shall be a condition of such probation or parole. The court may revoke probation and the Parole Commission may revoke parole if the defendant fails to comply with such order. In determining whether to revoke probation or parole, the court or Parole Commission shall consider the defendant's employment status, earning ability, financial resources, the willfulness of the defendant's failure to pay, and any other special circumstances that may have a bearing on the defendant's ability to pay.
 (h) An order of restitution may be enforced by United States or a victim named in the order to receive the restitution in the same manner as a judgment in a civil action.
 18 U.S.C. Sec. 3580 provides:
 (a) The court, in determining whether to order restitution under section 3579 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
 (b) The court may order the probation service of the court to obtain information pertaining to the factors set forth in subsection (a) of this section. The probation service of the court shall include the information collected in the report of presentence investigation or in a separate report, as the court directs.
 (c) The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.
 (d) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.
 (e) A conviction of a defendant for an offense involving the act giving rise to restitution under this section shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.
 
 
 [5]
 A district court in Pennsylvania recently has upheld the Act under a seventh amendment challenge. See United States v. Brown, 587 F.Supp. 1005 (E.D.Pa.1984). In addition, the Second Circuit has reached the same conclusion in an opinion published subsequent to the filing of this opinion. See United States v. Brown, 744 F.2d 905 (2d Cir.1984)
 
 
 [6]
 See Harland, Monetary Remedies for the Victims of Crime: Assessing the Role of the Criminal Courts, 30 U.C.L.A. L.Rev. 52, 92-93 (1982)
 
 
 [7]
 The types of losses recoverable under the VWPA also distinguish its restitution provisions from civil judgments. Whereas under the Act, speculative damages such as pain and suffering, see Implementation of the Restitution Provisions of the Victim and Witness Protection Act of 1982 at 9 (Aug. 29, 1983) (memorandum from D. Lowell Jensen, Associate Attorney General), and "loss of use" due to property damage, 18 U.S.C. Sec. 3579(b)(1), may not be recovered, such damages are frequently sought in civil actions. See generally Project, Congress Opens a Pandora's Box--The Restitution Provisions of the Victim and Witness Protection Act of 1982, 52 Fordham L.Rev. 507, 542 (1984)
 
 
 [8]
 See also 128 Cong.Rec. S11436 (daily ed. Sept. 14, 1982) (remarks of Sen. Mathias) ("[the Act permits], for the first time, a Federal judge to order restitution as part of the sentence for crimes involving loss of property or personal injury"); 128 Cong.Rec. S3860 (daily ed. April 22, 1982) (remarks of Sen. Chiles) ("it provides the remedy of restitution as a sentencing tool for judges")
 
 
 [9]
 A number of state sentencing statutes that authorize restitution also provide for civil enforcement of the restitution order. See, e.g., Fla.Stat.Ann. Sec. 775.089(6) (West Supp.1983); Ga.Code Ann. Sec. 17-14-13 (Michie 1982)
 
 
 [10]
 For example, courts will be called upon to determine the class of persons who can qualify as "victim[s] of the offense" under subsection 3579(a)(1). The VWPA and legislative history offer no guidance on this issue. Under the analogous provision of the probation statute, the defendant could be required to pay restitution only to victims of the offense "for which conviction was had." 18 U.S.C. Sec. 3651. This assured a defendant charged in a multicount indictment that he would be required to pay restitution only for injuries resulting from the counts on which he was actually convicted. If a defendant were held liable for restitution to victims of crimes of which no jury found him guilty, a due process violation may very well occur
 The statute is also silent on the questions of whether and how a court should apportion a restitution award involving multiple victims or multiple defendants. Because the court must base its award in part on the financial resources of the defendants as well as the amount of loss sustained by the victims, it is likely that in some cases each defendant will be unable to provide full restitution to each victim. The VWPA provides no guidance to aid the sentencing judge in determining which victims should get paid, how much each should receive, and who should be required to pay. For an enlightening discussion of the problems that may arise with multiple victims or multiple defendants, see Project, Congress Opens a Pandora's Box--The Restitution Provisions of the Victim and Witness Protection Act of 1982, 52 Fordham L.Rev. 507, 526-29 (1984).
 
 
 [11]
 Problems in this regard also may arise in the plea negotiation stage. The Act does not attempt to reconcile the indefinite nature of a restitution award with the requirement in Fed.R.Crim.P. 11(c)(1) that the defendant be apprised of the maximum possible penalty before entering a plea. Because restitution is awarded by the sentencing judge only after receiving the presentence investigative report, in many cases the Government will be unable to explain the defendant's potential restitution liability at the plea bargaining stage of the proceedings. Although the Department of Justice has indicated that before a plea is entered the defendant should be made aware that "full restitution" could be ordered, the maximum amount would not be known until the victim impact statement has been prepared. See Implementation of the Restitution Provisions of the Victim and Witness Protection Act of 1982 at 16 (Aug. 29, 1983) (memorandum from D. Lowell Jensen, Associate Attorney General)
 
 
 [12]
 Subsection 3579(d) states that the imposition of a restitution order should not "unduly complicate or prolong the sentencing process." The Department of Justice has indicated, however, that under appropriate circumstances the defendant could submit affidavits or testimony concerning his financial circumstances and earning potential. See Implementation of the Restitution Provisions of the Victim and Witness Protection Act of 1982 at 22 (Aug. 29, 1983) (memorandum from D. Lowell Jensen, Associate Attorney General)
 
 
 [13]
 See Fennell & Hall, Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts, 93 Harv.L.Rev. 1615, 1616 (1980)
 
 
 [14]
 The VWPA contains an enumeration of the types of recoverable expenses for property damage, 18 U.S.C. Sec. 3579(b)(1), and bodily injury, id. Sec. 3579(b)(2). The Probation Act simply provides that the defendant, as a condition of probation, "[m]ay be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." 18 U.S.C. Sec. 3651
 
 
 [15]
 The Court couched the analysis in terms of both due process and equal protection, but demonstrated a preference for the due process approach because "indigency in this context is a relative term rather than a classification ...." Bearden, 103 S.Ct. at 2069 n. 8
 
 
 [16]
 The court held that exigent circumstances justified the officers' actions in returning the defendant to his hotel room, and that the search of the hotel room was in turn justified under the "search incident to arrest" exception to the warrant requirement. Roper, 681 F.2d at 1358-59; see Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)