**Thomas McGEEHAN, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Director, Division of Corrections, etc., Respondent-Appellee.**

No. 74–4179.

United States Court of Appeals, Fifth Circuit.

Jan. 26, 1976.

James A. Gardner, Public Defender, 12th Judicial Circuit, Ellen Condon, Asst. Public Defender, Tampa, Fla., for petitioner-appellant.

Robert L. Shevin, Atty. Gen., Miami, Fla., William I. Munsey, Jr., Charles Corces, Jr., Asst. Attys. Gen., Tampa, Fla., for respondent-appellee.

Before GEWIN, BELL and SIMPSON, Circuit Judges.

PER CURIAM:

Thomas McGeehan, a prisoner in state custody, appeals from an order denying his petition for habeas corpus. The sole issue presented in his petition and on this appeal concerns the admissibility of certain evidence seized in a warrantless search and subsequently introduced at his trial for robbery. Based on the record of the state court's hearing on McGeehan's motion to suppress, the court below denied the petition without conducting an evidentiary hearing. We affirm.

At approximately one o'clock in the morning on February 6, 1973, a robbery occurred at the Palm Lounge in Tampa, Florida. The perpetrators, who had been drinking in the bar prior to commission of the crime, employed what appeared from the descriptions of witnesses to be a sawed-off shotgun, partially concealed beneath a trench coat. Witness testified that a female companion of the two men who actually held up the bar had gone outside for a few moments shortly before the crime occurred; had returned with what appeared to be an object concealed beneath a trench coat; and had then left the bar again. No one actually saw the woman hand the coat and concealed object to the men. The robbery victim testified, however, that McGeehan placed the object (concealed by the same coat that she had seen the companion bring in) over the edge of the bar, told her that it was a gun, and demanded the money in the cash register. The victim stated that she could see two barrels protruding from beneath the coat.

Investigating officers obtained a description of the individuals involved in the robbery, and of a car, observed earlier in the parking lot, in which they were believed to have fled. Acting on the suspicion of one of the officers, the police proceeded to a nearby trailer park, where they found parked by one of the trailers a car matching the witnesses' description. Five officers surrounded the trailer. As they approached, the inside lights were turned off and "shuffling" noises could be heard. The officers identified themselves and called upon the occupants to come out. One of the officers described at trial the events that followed:

A. . . . After calling a couple times the young lady there [McGeehan's co-defendant] stepped out of the door onto the trunk of the white chevrolet with the black hood.

Q. Stepped up onto the trunk?

A. The way the car was parked the trunk was even with the door of the trailer. And it would be like one step up from the doorway of the trailer onto this trunk. I told her to jump off the other side and lie down on the ground, which she did.

Q. And what happened then, sir?

A. We then called again for the occupants to come out. We could still hear people inside. No one came out. I moved from the south side of the trailer around to the north side of the trailer and went to a window and with my weapon I tapped on the glass, told

them we were the police and we wanted them to come out. While there at this window I could hear voices on the other side saying to the effect, "Keep your hands in front of you. Step out," which indicated to me that the people were coming out of the trailer.

Three more people, two men and a woman, emerged from the trailer. All four of the individuals were immediately placed under arrest; three of them fit the descriptions of the robbers.

The door of the darkened trailer was standing ajar; two of the officers, with weapons drawn, approached and entered. One officer described what they observed:

A. . . . We tried to find a light switch and we eventually did. There's like a hallway between the kitchen section and the bedroom. There is a bath and closets. We found the light in there. We walked in. My weapon was in my hand. As far as I knew there was still people in there. We went back to the back bedroom, turned the light on back there. And lying on my left side on the pile of clothing that was lying on the floor was a sawed-off shotgun. This weapon was loaded. And I subsequently confiscated it as evidence.

In the kitchen by the table there and the stove and kitchen equipment there was another pile of clothing on the floor. And we found an overcoat, a trench coat type, and a black knit type cap.

The gun, coat, and cap were admitted into evidence at McGeehan's trial.

Two recent decisions by this court guide our determination of the instant case. In *United States v. Smith*, 515 F.2d 1028 (5th Cir. 1975), on strikingly similar facts, we upheld the admissibility of evidence found in plain view during a protective sweep of a trailer following the arrest, outside the dwelling, of the defendant. The officers had received information that the defendant was armed and accompanied by at least one other person, yet he emerged from the trailer

alone and unarmed. *Hopkins v. Alabama*, 524 F.2d 473 (5th Cir. 1975), also upheld the warrantless search of a dwelling following an arrest outside. Officers were investigating a robbery that had occurred earlier on the same day; when they knocked on the door, they were fired upon from inside. Searches of all the persons who eventually exited from the house did not disclose the weapon used in the shooting.

The facts of the instant case, like those in *Smith* and *Hopkins*, disclose such a "high potentiality for danger surrounding the arrest . . . that the entry into the trailer was allowable for the purpose of making a cursory safety check." 515 F.2d at 1031; *see United States v. Looney*, 481 F.2d 31 (5th Cir. 1973). An armed robbery had occurred only about an hour earlier; it was nighttime; the trailer was dark; three of those who exited fit the descriptions furnished to the officers, as did the automobile parked by the door; none of the suspects surrendered a weapon. The officers knew that a shotgun had been used in the robbery, and they concluded that additional confederates might be concealed inside the darkened trailer with the missing shotgun. As we held in *Smith*, "the circumstances provided, at the least, probable cause to believe that a serious threat to safety was presented." 515 F.2d at 1031.

Neither *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), nor *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), compels a contrary conclusion. The statement of this court in *Hopkins* is equally appropriate to the uncontested facts as disclosed by the record in this case:

Neither [*Chimel* nor *Vale*] presented the exigent circumstances and fact setting shown in this case. . . . Since the gun had not been found before the search, the officers could have reasonably feared that the weapon . . . still remained in the house. The immediate need to ensure that no one remained in the house preparing

to fire the yet unfound weapon obviously justified this warrantless search.

524 F.2d at 475. As the Supreme Court said in *Warden v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782, 787 (1967), "Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that [no others were present] and that the police had control of all weapons which could be used against them . . . ." It is clear from the record that the gun and clothes were in plain view, and in light of our decision that the entry was permissible, they were properly admitted into evidence.

Affirmed.