UNITED STATES of America,

v.

Glenn Samuel SUNKETT, Defendant.

No. Crim.A. 1:99–CR–050201.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 11, 2000.

Richard H. Deane, Jr., United States Attorney, Jane Swift, Assistant United States Attorney, Atlanta, GA, for plaintiff.

David H. Jones, King & King & Jones, Atlanta, GA, for defendants.

### *ORDER*

STORY, District Judge.

This case is before the Court for consideration of the Report and Recommendation [22–1] of Magistrate Judge Gerrilyn G. Brill recommending the granting of Defendant's Motion to Suppress [7–1]. After reviewing the entire record, the Court enters the following Order.

As an initial matter, the Government's Motion to Supplement Record [25–1] is **GRANTED.** The Court adopts the Findings of Fact as set out in the Report and Recommendation. As appropriate, the Court will make additional findings of fact hereafter.

The Court concurs with and adopts Judge Brill's analysis of the facts under the standards set out for the second type of *Buie* search. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). However, the Court disagrees with Judge Brill's conclusion that the

sweep conducted in this case was a second type *Buie* search.

The court in *Buie* held:

We [ ] hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.*, 494 U.S. at 334, 110 S.Ct. at 1098.

The Court concludes that the search of the closet in which the weapons were found was the first type of protective sweep contemplated by *Buie*. Judge Brill correctly found that the officers searched the entire apartment. However, the conclusion that this was a type two *Buie* search does not necessarily follow from that finding.

Consideration must be given to the size and layout of the apartment in light of the justification for the limited search. In *Buie*, the Court explained the justification for protective sweeps:

. [T]here is an [ ] interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecut-

ing him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." Aambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

We recognized in *Terry* that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry [v. State of Ohio]*, *supra*, 392 U.S. [1], 24–25, 88 S.Ct. [1868], 1881–1882. But we permitted the intrusion, which was no more than necessary to protect the officer from harm. Nor do we here suggest, as the State does, that entering rooms not examined prior to the arrest is a de minimis intrusion that may be disregarded. We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest. That interest is sufficient to outweigh the intrusion such procedures may entail.

*Id.*, 494 U.S. at 333–34, 110 S.Ct. at 1098.

■ In this case, the front door of the apartment opened into a living room—dining room area. Adjacent to this area was a kitchen which opened into the living room—dining room. A small hallway also opened into the living room—dining room area. The bathroom and bedroom opened into this hallway. The front door of the apartment was visible from the door of the bedroom. [Gov't Ex. 8; Decl. of Lawrence Guerra.] Anyone in the bedroom posed an immediate risk to the officers in the doorway of the apartment. Therefore, a search of the bedroom was an appropriate type one *Buie* search.

■ At first blush, a search of the bedroom closet may appear more problematic. However, consideration of the totality of the circumstances compels the conclusion

that a limited search of the closet was reasonable. When the officers entered the bedroom, they found the closet door ajar. They conducted a brief limited search of the closet looking only in places where a person could hide. In plain view, they found the weapons in issue. To suggest that a search of the closet was unreasonable would ignore the reality of the dangers posed in circumstances such as those involved in this case. If a person were in the bedroom and retreated to the closet as an officer approached, the officer is in no less danger of immediate harm. The Court recognizes that this logic could arguably be used to extend a search to every room in a residence, and therefore, the analysis must have a reasonable limit. The *Buie* court provided that limit. The court recognized that a potential assailant could hide in a closet until it was safe to launch an attack and thus, specifically authorized searches of closets.

■ Consistent with *Buie,* this Court concludes that a protective sweep is appropriate in any room adjacent to the area of the arrest from which an attack could be immediately launched (i.e., from which the scene of the arrest is visible) and in any location in such rooms, including closets, in which an attacker could hide. Therefore, the officers were permitted to conduct a protective sweep which included the bedroom closet.

■ The sweep conducted by the officers was brief, lasting only a few minutes, and was limited to areas where a person could hide. The cases were found in plain view within the closet. Though the weapons were in cases, the nature of the contents of those cases was readily apparent to the officers. *See Arkansas v. Sanders,* 442 U.S. 753, 765 n. 13, 99 S.Ct. 2586, 2594 n. 13, 61 L.Ed.2d 235 (1979), *overruled on other grounds by California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("[S]ome containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance."); *see also United States v. Villarreal,* 963 F.2d 770, 776 (5th Cir.1992) ("The Supreme Court has offered gun cases ... as examples of containers the distinctive characteristics of which proclaim their contents.") Therefore, the officers were authorized to seize the weapons.

For the foregoing reasons, Defendant's Motion to Suppress [7–1] is **DENIED.**

## REPORT AND RECOMMENDATION

BRILL, United States Magistrate Judge.

Defendant Glenn Samuel Sunkett is charged in a one-count criminal indictment with possessing firearms after having been convicted of a felony, in violation of Title 18, United States Code, Sections 922(g) and 924(a)(2). He moves to suppress the firearms that were seized from his apartment on August 27, 1999. A hearing on defendant's motion to suppress was held before the undersigned Magistrate Judge on November 19, 1999. All transcript references are to the transcript of that hearing.

### I. Facts

In July 1999, Special Agent Joe Parris of the Federal Bureau of Investigation ("FBI") received information from the FBI's San Francisco office that Glenn Samuel Sunkett, a fugitive wanted on a federal warrant for unlawful flight to avoid confinement, was living in the Atlanta area. (Tr. 4–5). The information from San Francisco included two photographs of Sunkett and background information, including information that he used an alias of Jacquan Bradley and a warning that he had violently resisted arrest the last time he had been arrested. Upon obtaining a copy of Sunkett's criminal history, Agent Parris learned that Sunkett had a history of drug, stolen property, and fraud arrests. (Tr. 4). No evidence was presented as to

the type of offense for which Sunkett was deemed to be a fugitive.

Through a utilities check using the alias, Agent Parris learned that Sunkett was living as Jacquan Bradley in an apartment at the Autumn Bend Apartment Complex on Roswell Road in Sandy Springs, Fulton County, Georgia. (Tr. 5). The neighborhood was known to the FBI as a high crime area. (Tr. 26) Sunkett's wife had written a check dated August 2, 1999 to pay for his August rent. (Tr. 5). The agents had information that Sunkett's wife, ex-wife, or estranged wife lived in the Marietta area.[1] (Tr. 5).

On Friday, August 27, 1999, at approximately 5:00 p.m., Agent Parris was informed by a cooperating individual that Sunkett was at home in his apartment. (Tr. 6, 13). Agent Parris did not ask the cooperating individual if anyone else was present with Sunkett, and the agent had no information as to whether anyone else was in the apartment. (Tr. 15, 63, 65).

Someone in the management office of the apartment complex told Agent Parris that they had not seen "Bradley" in a couple of weeks, but that in the past, people had been in and out of the apartment. (Tr. 15). Although the agents had conducted surveillance of the apartment prior to August 27, they never noticed anyone going in or out of the apartment. (Tr. 16). There was no evidence that anyone other than "Bradley" was on the lease.

After receiving the information from the cooperating individual, Agent Parris assembled a team of ten agents. (Tr. 6–7, 29–30, 64). At a pre-arrest briefing, Agent Parris told the other agents that Sunkett had an extensive criminal history and violent tendencies toward law enforcement officers. However, Agent Parris had no information that Sunkett had ever been in possession of firearms. (Tr. 17–18).

The FBI agents arrived at the Autumn Bend Apartments at approximately 5:40 p.m. on August 27. (Tr. 26). Agents

Greene and Guerra drove to the back of Sunkett's ground floor apartment to preclude his escape from the back and to make the arrest from there if necessary. (Tr. 7, 19, 32). The other agents entered the apartment building through a common entrance at the front of the building. The common entrance led to a half flight of stairs, then to a landing with two apartment doors, one to the left and one to the right.

As Agents Greene and Guerra approached the apartment from the rear, they observed a black male meeting the general description of Sunkett standing just inside the apartment, behind a screen door at the back, next to a sliding glass door. (Tr. 32, 34, 36, 66–67). As the agents approached the back door, Agent Greene identified himself and Agent Guerra as FBI agents, pointed his weapon at the occupant and told him not to move. (Tr. 34–68). After briefly looking at Agents Greene and Guerra, Sunkett turned and ran toward the inside of the apartment and out of sight. (Tr. 34, 63, 68–69). Agents Greene and Guerra jumped over the patio partition, approached the sliding glass door, and held their position briefly, awaiting entry of their fellow agents from the front of the apartment. (Tr. 34–35, 69).

While Agents Greene and Guerra were standing outside at the glass door, Agent Guerra put his face against the screen and saw that the bolt on the front door of the apartment was moving. About the same time, Agents Greene and Guerra heard yelling and the sounds of a struggle from the other side of the front door. (Tr. 35, 39, 70). At that point, they entered the apartment at the back, through the screen on the sliding glass door. (Tr. 35, 36). Their purpose in entering was to assist the other agents in making the arrest and to ensure that the apartment was secure. (Tr. 39, 71).

1. Marietta is in Cobb County, Georgia.

Meanwhile, Agent Parris and the other agents at the front entrance encountered Sunkett standing outside of his apartment in the common hallway, trying to lock his apartment's front door. (Tr. 8). The agents identified themselves, drew their weapons, pointed them at Sunkett and ordered him to turn around, put his hands where the agents could see them, and get down on the floor. (Tr. 9, 20). Sunkett did not comply. He put his hands into his pockets and would not remove them. (Tr. 9–10). The agents struggled with Sunkett in an effort to put his hands behind his back and handcuff him. (Tr. 9–10, 38).

As the agents were struggling with Sunkett just outside the front door, Agent Greene opened the door from the inside and assisted in handcuffing Sunkett. (Tr. 10, 38–39) Agent Guerra remained in the dining room of the apartment with his gun pointed towards the bedroom door to guard against the possibility that someone was in the bedroom.[2] (Tr. 71).

After defendant was under control and handcuffed, he was held on the floor of the stair landing. (Tr. 11, 22). He was never taken back inside the apartment. (Tr. 22). He remained on the floor just outside the front door for about five minutes before being transferred to an FBI car. (Tr. 23).

While the other agents remained at the front door, Agent Greene went back inside the apartment, joined Agent Guerra, and informed him that they were now going to "clear the rest of the apartment." (Tr. 40). Sunkett's hands were in handcuffs behind his back and he was on the floor when Agent Greene went back inside. At that point, Sunkett was "secured" and "under control" but not fully compliant. He was "still agitated" and "there seemed to be some fight left in him yet." (Gov. Brf. 5–6, 8; Tr. 38–40, 48, 57, 71).

While Agent Guerra maintained his position in the dining room, Agent Greene went first to the kitchen and made sure it was clear. (Tr. 40, 71). Agent Greene then entered the bathroom. (Tr. 71). Agent Greene and Agent Guerra then entered the apartment's only bedroom. (Tr. 40, 71). While in the bedroom, Agent Greene checked behind the bed, looked underneath the bed and lifted up some clothes. (Tr. 40, 72). The agents then entered the walk-in closet in the bedroom. Agent Greene saw a large pile of loose clothes in the corner of the closet, along with a large box full of clothes behind which a person could be hiding. The pile of clothes was also large enough to conceal a person. (Tr. 43, 45; Gov.Exhs. 3, 4). On the right upper shelf of the closet, Agent Guerra observed a soft gun case and so informed Agent Greene. (Tr. 43, 62, 72–73; Gov.Exhs. 1, 2, 5). Agent Guerra recognized the case as almost identical to a gun case he had at home. (Tr. 73). The agents also observed a white ballistic vest hanging in the back of the closet. (Tr. 45, 73).

As Agent Greene continued to the back of the closet, he saw four black hard-shell gun cases on the floor, and he told Agent Guerra about them. (Tr. 45–46; Gov.Exh. 6). Based upon Agent Greene's experience and his ownership of weapons, he recognized the cases as gun cases at once. (Tr. 46, 52–63).

After securing the closet and ensuring that no one was hiding under the clothing or behind the box, Agents Greene and Guerra removed the ballistic vest and five gun cases from the closet. (Tr. 46–47). One of the hard gun cases had a Glock logo on the outside. (Tr. 61). As Agent Guerra removed the soft gun case, he could feel the heavy L-shape and handle of a gun inside. (Tr. 74). Agents Greene and Guerra opened the cases and found a

---

2. The front door of the apartment opened into the dining room portion of a combination dining room/living room. A hallway leading from the dining room/living room had doors that opened to the apartment's only bedroom and bathroom. The bedroom had a walk-in closet. A rough diagram of the apartment was entered into evidence as Government's Exhibit 8. (Tr. p. 35).

gun inside each one, some of which were loaded. (Tr. 48, 74, 75). The agents seized the guns and their cases. (Tr. 49). They also seized a passport that they found lying on an ironing board inside the closet door. Agent Greene picked up the passport and opened it and observed that it was a United States Passport with defendant's picture on it, but a name other than Sunkett. (Tr. 49). The entire search or sweep of the apartment was completed in "a matter of minutes." (Tr. 49).

Defendant seeks to suppress the evidence that was found in his bedroom closet.

## II. *Discussion*

### A. *Protective Sweep*

The government first seeks to justify the officers' warrantless search of defendant's apartment as a "protective sweep." In *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court held that under certain circumstances, police officers may enter a dwelling without a warrant, incident to an in-home arrest, and conduct a "protective sweep" to ensure the officers' safety. The Court recognized two types of protective sweeps. *See United States v. Mayo*, 792 F.Supp. 768, 773 (M.D.Ala.1992). First, during a search incident to an arrest occurring inside a home, officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. Second, officers may conduct a more pervasive search when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id. See also United States v. Colbert*, 76 F.3d 773, 776 (6th Cir.1996) (discussing the two types of protective sweeps allowed by *Buie*); 3 LaFave

*Search & Seizure*, § 6.4(c) (1996 ed.). In either type of sweep, the search "many extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 336, 110 S.Ct. 1093.

In its brief, the government does not discuss which type of *Buie* sweep was conducted in this case. Because the agents looked into every room in the apartment, including rooms not immediately adjacent to the front door, and every place within those rooms that a person could be hiding, their search must meet the standard for the second type of *Buie* search. To rule otherwise would render meaningless the phrase "spaces immediately adjoining the place of arrest" contained in *Buie's* description of the areas allowed to be searched solely on the basis of the in-home arrest. *Cf. State v. Kruse*, 175 Wis.2d 89, 499 N.W.2d 185, 189 (App. 1993) ("the search of a bedroom closet that is separated by a wall and is down the hall and around the corner approximately eighteen feet from the arrest area is too remote to be subject to a precautionary search without reasonable suspicion"). Thus, the question becomes whether there were facts from which a reasonable officer could believe that another person was in the apartment who posed a danger to the officers on the scene. *See United States v. Hromada*, 49 F.3d 685, 690 (11th Cir.1995).

The government argues that agents had reason to believe that defendant "might be in the company of his wife or of one or more others in the apartment." (Gov. Brf.9). However, the fact that someone else "might be" present is not a strong enough basis on which to justify the more pervasive type of *Buie* sweep conducted in this case. The only evidence regarding the possibility of another person in the apartment was that, at some unspecified previous time, someone in the manage-

ment office had seen individuals going in and out of the apartment, that defendant had a wife or girlfriend in Cobb County, and that she had paid his rent for the month on his Fulton County apartment. (Tr. pp. 5, 15). This evidence does not establish that the officers had reason to believe that any other person was present in defendant's apartment at the time of the arrest. In that respect, this case is similar to the recent Eleventh Circuit case of *United States v. Chaves,* 169 F.3d 687 (11th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 534, 145 L.Ed.2d 414, (1999). In *Chaves,* the Court found that a search could not be justified as a protective sweep because the government failed to point to any "specific and articulable facts that would lead a reasonably prudent officer to believe that, at the time of the sweep, a sweep was necessary for protective purposes." The following discussion from *Chaves* is instructive:

> Much of the government's argument why a sweep was needed for protective purposes is not based on any specific facts in the government's possession, but rather is based on the lack of information in the government's possession. The testimony at the suppression hearing indicates that the officers had no information regarding the inside of the warehouse. However, in the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case. *See United States v. Colbert,* 76 F.3d 773, 778 (6th Cir.1996) ("Lack of information cannot provide an articulable basis upon which to justify a protective sweep."); *see also Sharrar v. Felsing,* 128 F.3d 810, 825 (3d Cir.1997) ("agree[ing] with ... *Colbert* that '[n]o information cannot be an articulable basis for a sweep that requires information to justify it in the first place' ").

*Id.,* 169 F.3d at 692.

As in *Chaves,* the government here did not show that there were specific and ar-

ticulable facts indicating that any other individual was in the apartment at the time of arrest, much less an individual who posed a threat to the agents. *See* 3 La-Fave *Search & Seizure,* § 6.4(c) pp. 326–27 (1996 ed.) ("The *Buie* reasonable suspicion test ... appears to require reasonable suspicion both (a) that another person is there, and (b) that the person is dangerous.").

In *United States v. Donald Edward Hooper,* No. 1:96–CR–135 (N.D.Ga., February 3, 1997) (copy of order attached), United States District Judge J. Owen Forrester declined to accept the recommendation of the undersigned magistrate judge and granted the defendant's motion to suppress on the ground that the search of Hooper's home could not be justified as a *Buie* protective sweep. Hooper had been arrested at the front door of his house on a warrant charging him with burglary of fully loaded firearms. Officers then conducted a sweep and found weapons. Hooper was charged with being a felon in possession of a firearm. Judge Forrester found that a sweep could not be justified even though the officers knew there were weapons in the house because the officers had no reason to believe that any other person was present. *Id.* at 6. The government did not appeal Judge Forrester's order and dismissed its case against Hooper.

The only three cases (other than *Buie* ) cited by the government in the section of its brief that discusses protective sweeps are *United States v. Standridge,* 810 F.2d 1034 (11th Cir.), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987); *McGeehan v. Wainwright,* 526 F.2d 397 (5th Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); and *United States v. Hromada,* 49 F.3d 685, 690 (11th Cir.1995).

In *Standridge,* the Eleventh Circuit held that officers were justified in conducting a protective sweep of defendant's motel room and adjoining bathroom because de-

fendant might not have been alone and physically resisted arrest. In *McGeehan*, the court upheld a protective sweep of defendant's trailer following defendant's arrest immediately outside the trailer for an armed robbery that had occurred an hour earlier. The court noted that there was a high potential for danger because a shotgun used in the robbery was not accounted for and "additional confederates might [have been] concealed inside the darkened trailer with the missing shotgun." *Id.* at 398.

At first glance, *Standridge* and *McGeehan* appear to provide some support for the government's position. However, they both were decided before *Buie*, and do not apply the standard set forth by the Supreme Court in *Buie*. *Cf.* 3 LaFave *Search & Seizure*, § 6.4(c), p. 330 (1996 ed.) (observing that some pre-*Buie* authority seemed to view a protective sweep as a proper routine practice incident to any in-premises arrest, and noting that *Buie* rejected the state's request for a bright-line rule that would allow a protective sweep whenever the police make an in-home arrest for a violent crime). Therefore, these cases are of limited value. Also, the officers in *Standridge* searched only the room in which defendant was arrested and the adjoining bathroom; thus, their search was more limited than the search conducted in this case and could possibly have been justified as the first type of *Buie* sweep. And in *McGeehan*, the officers had more reason to fear danger from within the residence than the officers in the instant case because they were making an arrest for a violent crime in which there were accomplices and a missing weapon.

*Hromada* was decided after *Buie*. In *Hromada*, officers made an in-home arrest for growing and distributing marijuana, and "swept" the entire residence for others who might be present. *Hromada* is different from the instant case because the officers there had "strong indications" that defendant did not operate alone. *Id.*, 49 F.3d at 687.[3] And, in fact, a girlfriend and roommate were found in the home. *Id.* at 688. As discussed above, in this case, officers had no strong indication that anyone else was present with Sunkett in his apartment.

To the extent that the government attempts to justify a *Buie* protective sweep based on the possibility of danger from Sunkett himself, the court rejects that argument. A similar argument was made and rejected as follows in *Chaves*:

> The government also points to the fact that Garcia and Torres were arrested with weapons in their possession. However, this information "implies nothing regarding the possible presence of anyone being in [the warehouse]—the touchstone of the protective sweep analysis." *Sharrar*, 128 F.3d at 825; *see also Colbert*, 76 F.3d at 777 ("The facts on which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from an attack by a third party during the arrest, not the dangerousness of the arrested individual.").

*Id.*, 169 F.3d at 692.

Moreover, Sunkett was on the ground with his hands handcuffed behind his back, outside his apartment, and in the presence of ten[4] armed FBI agents at the time the sweep was conducted. There was not a realistic possibility that he had an opportu-

---

3. Specifically, on the day of an undercover drug transaction, "Hromada was observed leaving and returning to his home with a woman present during the sale. Also, during one recorded telephone call to Hromada's home, [the undercover agent] overheard Hromada consult with a male at his home about the price he should charge for the drugs." *Hromada*, 49 F.3d at 687.

4. In total there were ten FBI agents present on the scene. Agents Greene and Guerra were in the apartment doing the sweep. The court assumes the remaining agents remained with the defendant. Even if fewer than ten agents were present, the court's analysis does not change.

nity to escape and return to his bedroom at that point.

For these reasons, the search of defendant's apartment cannot be justified as a protective sweep.

## B. Search Incident to Arrest

The government also attempts to justify the search of the defendant's apartment as a search incident to a lawful arrest.

In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court held that in order to be justified as incident to a lawful arrest, a search of a dwelling must be confined to the area within the arrestee's reach at the time of his arrest—"the area from within which he might gain possession of a weapon or destructible evidence." 395 U.S. at 763, 89 S.Ct. at 2040. The government cites several cases to support the proposition that "since *Chimel*, the courts have interpreted broadly both the concept of immediate control and the concept of likelihood o[f] danger or destruction of evidence." (Gov. Brf.15). The court has examined each of these cases and finds that their interpretation of *Chimel* is not sufficiently broad to uphold the search conducted in this case.

The proper inquiry is whether the area searched was within the defendant's immediate control at the time of his arrest. *See, e.g., United States v. Abdul–Saboor*, 85 F.3d 664 (D.C.Cir.1996). Whether the search is reasonable must depend on the particular facts of the case; however, the scope of a premises search incident to arrest must be limited to the legitimate purposes under *Chimel*, *i.e.*, to remove weapons that the arrestee might use to resist arrest or effect his escape, and to prevent the concealment or destruction of evidence. *See, e.g., United States v. Jones*, 475 F.2d 723 (5th Cir.), *cert. denied*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973).

In that regard, it is significant that Sunkett had already been placed in handcuffs behind his back, was on the ground, was outside the front door to his apart-

ment, and was in the presence of ten armed FBI agents. While the government emphasizes that Sunkett was still not fully compliant, it was all but impossible that he would gain access to weapons inside the bedroom of his apartment. *See, e.g., United States v. Cueto*, 611 F.2d 1056 (5th Cir.1980) (finding that searches inside defendant's suit bag and between the mattresses in his room were not permissible under *Chimel* because these areas were not within defendant's reach, and finding that because defendant had been handcuffed and subdued, he was not in a position to reach concealed weapons); *United States v. Johnson*, 16 F.3d 69 (5th Cir. 1994) (finding that where defendant, arrested in his office, was sitting at desk with one officer behind him and three officers around him, his briefcase, eight feet away, was not subject to search); *United States v. Lyons*, 706 F.2d 321, 330 (D.C.Cir.1983) ("To determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched, conceivably accessible to the arrestee—assuming that he was neither an acrobat [nor] a Houdini.")

The only Eleventh Circuit case cited by the government in the section of its brief attempting to justify the search as one incident to arrest is *United States v. Roper*, 681 F.2d 1354 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983). In *Roper*, defendant was arrested in the hallway outside his motel room and immediately escorted back into the room. The court held that the arresting agents were authorized to search "the area within his control" in the motel room for weapons and evidence. *Id.* at 1358. *Roper* is clearly distinguishable from the instant case because the court based its decision on its finding that exigent circumstances, *i.e.*, the presence of other guests and staff members, and simultaneous arrests in the same motel hallway, necessitated that the agents escort the defendant from the hall back into his

motel room. In this case, Sunkett was never brought back into his apartment, and there was apparently no reason to even consider doing so.

The government relies most heavily on *United States v. Abdul–Saboor*, 85 F.3d 664 (D.C.Cir.1996). In that case, deputy marshals went to the defendant's home to arrest him on a bench warrant. The defendant, who was wearing only a bathrobe, asked and was allowed to change clothes in his bedroom before leaving the apartment. When he entered his bedroom, he picked up a loaded gun and tried to hide it from the deputy marshals. A deputy marshal then handcuffed the defendant to a chair four feet outside his bedroom doorway. When one of the deputies returned to the bedroom to pick up defendant's handgun, he noticed other weapons and ammunition. Another deputy then entered the bedroom and found several bags of cocaine and two shotguns, one under a mattress and another on the floor, wrapped in a white plastic trash bag. The deputies then searched the apartment for additional weapons and found additional contraband.

In upholding the search, the court found it significant that the room searched was within the area where the arrest occurred and was an area from which the defendant had in fact obtained a weapon. *Abdul–Saboor*, 85 F.3d at 668. In the instant case, Sunkett was arrested in an area far removed from his bedroom closet, and the agents had no knowledge of any weapons in the apartment. This court does not find the similarities between the instant case and *Abdul–Saboor* sufficient to justify the search of Sunkett's apartment as a search incident to arrest.

In *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), shortly after deciding *Chimel*, the Supreme Court held that officers could not conduct a lawful search incident to arrest of an arrestee's house when the arrest took place on the front steps. "If a search of a house is to be upheld as incident to an arrest, that arrest must take place inside the house, not somewhere outside—whether two blocks away, twenty feet away, or on the sidewalk near the front steps." *Vale*, 399 U.S. at 33–34, 90 S.Ct. 1969 (citations omitted). The government does not discuss *Vale* in its brief. Even if not controlling, *Vale* is strong authority in support of the defendant's position on this motion to suppress.

For the above reasons, the undersigned finds that the warrantless search of defendant's bedroom closet cannot be justified as a search incident to his lawful arrest.

C. *Plain View*

Finally, the government attempts to justify the search on the ground that the weapon cases in Sunkett's closet were in "plain view." In order to lawfully seize evidence found in plain view during a warrantless search, two criteria must be met. First, the agents or officers must have lawful access to the object seized, and second, the incriminating nature of the object seized must have been immediately apparent. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). As discussed above, the government has not shown that the agents were lawfully in the defendant's bedroom closet; therefore, the government has not established the first criterion of the plain view doctrine.

III. *Conclusion*

For the above reasons, the undersigned **RECOMMENDS** that the defendant's Motion to Suppress be **GRANTED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

IT IS THEREFORE ORDERED and ADJUDGED that this action be, and the same is hereby, declared Ready For Trial.

January 14, 2000.

IN THE UNITED STATES DISTRICT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA

vs.

DONALD EDWARD HOOPER

CRIMINAL ACTION NO. 1:96–cr–0135–JOF

FILED Feb. 3, 1997

*ORDER*

This matter is before the court on Defendant's motion to suppress [9–1].

## I. FACTS

On September 20, 1995, James Canupp, a Gwinnett County police officer, received a call from Defendant's brother, Billy Hooper, informing him that his daughter might have information about a burglary. Officer Canupp met with Billy Hooper and his daughter, Dusty Lynn Hooper, later that night. Dusty Hooper informed Officer Canupp that she had driven Defendant around, and that he had met with a group of people and then asked her to drive him to a trailer park, that he had mentioned "stolen goods," that he told her that he was going to get "his guns," and that she had then seen him break into a home. Around the same time that Canupp was learning this information, the Gwinnett County Police received a call from the owner of the burglarized home informing them that three fully loaded firearms, including two shotguns and a .22 caliber revolver, were missing.

Officer Canupp obtained an arrest warrant based on the information from Dusty Lynn Hooper and the owner of the burglarized home. He went, together with two Suwanee police officers, Officer Walker and Officer Loper, to Defendant's house. Upon arriving, one officer peered through a back window and observed Defendant lying on a bed. In order to get him to exit the house, the police officers yelled that his dog had been injured. The Defendant then opened the front door. At that point, Officer Canupp arrested him. While the arrest was occurring, the Suwanee police officers entered the home and looked through the house. Upon seeing a revolver on the nightstand in the bedroom and two shotguns under the raised bed in plain view, the officers summoned Officer Canupp, who seized the guns since they matched the description of the stolen weapons.

The next day, September 21, 1995, after meeting with the owner of the burglarized home and learning that items besides the three firearms were missing, Officer Canupp applied for a search warrant for Mr. Hooper's residence. Pursuant to the issued warrant, Officer Canupp searched the home and seized additional items.

Defendant has moved to suppress the three firearms seized at the time of the arrest and the items seized the following day.

## II. DISCUSSION

### A. *Magistrate Judge Brill's Report and Recommendation*

After an evidentiary hearing held on August 5, 1996, Magistrate Judge Brill issued a Report and Recommendation on the motion to dismiss. In her Report, the Magistrate Judge found that

the strong evidence of the presence of loaded weapons in the house, together with the uncertainty of whether anyone else was present and the fact that the police were arresting Defendant when it was dark outside, tips the balance in favor of allowing the police to conduct a limited security sweep in the interests of their own safety.

In addition, the Magistrate Judge concluded that the fact that Officer Canupp did not participate in the sweep itself, but then

seized the weapons after the Suwanee officers discovered them, was irrelevant. As a result, the Magistrate Judge recommended that Defendant's motion to suppress be denied.

Defendant filed several objections to the Magistrate Judge's Report. First, Defendant contends that the officer in charge only briefed the Suwanee police shortly before the arrest, and that it was these Suwanee police who did the protective sweep. Defendant argues that these officers did not know about the guns, so the sweep was improper. Second, Defendant asserts that these officers exited the house after finding the guns, and that Officer Canupp then went in and seized them. Defendant argues that the security sweep was over when the officers exited the house, and it was improper for Officer Canupp then to enter the house and seize them. Third, Defendant contends that on the facts of this case, the security sweep was improper. In support of this argument, Defendant cites to a number of cases where protective searches were upheld when the police had specific information about the presence of another party that posed a danger. In the present case, in contrast, Defendant argues that the police had little or no evidence of the presence of an additional person in the house. Finally, Defendant objects to the Magistrate Judge's factual finding that Officer Canupp had knowledge, before he went to the house, that a female guest might be present.

As a result of these objections to the Report and due to factual disputes, this court held a de novo hearing on the motion to suppress on October 24, 1996.

### B. *October 24, 1996 Hearing*

At the de novo hearing, this court determined that Officer Canupp did not ask Officer Walker or Officer Loper to conduct the protective sweep. Further, Officer Canupp did not communicate to them his belief that Defendant might not be alone because a female acquaintance sometimes stayed at the residence where they were about to execute the warrant (October 24, 1996 Hearing, Trans. at 24–25). As a result, the court concluded that the Suwanee police officers did not obtain any information from Officer Canupp that would have given them an articulable reason for the search.[1]

The Suwanee police officers testified at the hearing that their practice was to conduct a security sweep of a house when making an arrest outside the house "only when there [are] weapons involved that can pose a danger." (Trans. at 10). As a result of the evidence offered at the hearing, the court concluded that the sweep incident to the arrest was conducted by officers whose only knowledge involving any threats to their safety was that there might be weapons in the house. At the time of the search, which occurred while Defendant was being arrested at his front door, the Suwanee officers had no reason to believe that anyone else might be present in the house.

At the close of the hearing, the court informed the parties that, after a review of all the cases cited to the court and an exhaustive search of its own, it had not found any case that upheld a protective search based solely on a belief that weapons might be in the house. The court then granted the Government additional time to submit to the court relevant case law on such a search and Defendant to respond to any additional submitted cases.

### C. *Additional submitted authority and discussion*

The Government argues that the seizure of the weapons during the warrantless search of Defendant's home was justified because the officers were conducting a

---

1.  Based on this determination, the court concluded that it did not have to conduct an inquiry into the issue of the credibility of Officer Canupp's statement that he believed Defendant might not be alone.

"protective sweep" in accordance with *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). There are two types of protective sweeps that courts have distilled from the *Buie* opinion. *See U.S. v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996). First, during a search incident to arrest that occurs inside a home, officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093; *Colbert*, 76 F.3d at 776. Second, police may conduct a pervasive protective sweep of a home if they have "articulable facts which, taken together with the rational inferences from the facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093; *Colbert*, 76 F.3d at 776.

The case at bar involves a pervasive search, and therefore, if it stands at all, it must be justified as being one of the second type of *Buie* searches.[2] In response to this court's request at the October 24 hearing to provide additional case law, the Government has filed a brief that contains three cases that allegedly support the present search.

The first case cited, *United States v. Lauter*, 57 F.3d 212 (2d Cir.1995), differs factually from the case at bar. In *Lauter*, the Defendant was arrested in the first room of a small two-room apartment. Incident to the arrest, a police officer searched the adjoining bedroom after he saw another officer escorting a girl out of it. In the bedroom, a gun was found. The Second Circuit upheld the search on the grounds that the bedroom, in such a small apartment, was "immediately adjoining" the place of arrest. *Id.* at 216–17. As a result, the search was a *Buie* one type search, and not the more pervasive *Buie* two type sweep that is relevant to the present case. Furthermore, the Defendant in *Lauter* was not alone in the apartment.

The second case cited by the Government, *United States v. Helmstetter*, 56 F.3d 21 (5th Cir.1995), is also distinguishable from the case at bar. This case is also a *Buie* one type search case, in that police officers searched and seized a weapon that protruded from underneath the chair in which the handcuffed defendant sat. *Id.* at 23. The court justified the search on the grounds that, although restrained, the defendant could have still reached the "readily accessible weapon." *Id.*

The third and final case offered by the Government is *United States v. Mobley*, 40 F.3d 688 (4th Cir.1994), *cert. denied*, 514 U.S. 1129, 115 S.Ct. 2005, 131 L.Ed.2d 1005 (1995). In *Mobley*, FBI special agents arrived at the defendant's apartment with arrest and search warrants. The FBI agents then questioned the defendant about any dangerous objects in his apartment even though he had requested an attorney after being given his Miranda rights. *Id.* at 691. In response to their questioning, he informed the agents that

---

2. Magistrate Judge Brill made this determination in her Report and Recommendation, and this court reiterated that same conclusion at the close of the October 24 hearing: "This is still a Buie two, not a Buie one search because the search was not just of the area immediately around Mr. Hooper, even though Mr. Hooper was in the living room. It extended clearly into the bedroom and other places." (Trans. at 31).

For the first time, however, the Government argues in its Response to the Motion to Suppress filed after the hearing that this search can also be justified as a Buie one search. The court notes that the Government has waived this argument by not objecting to the Magistrate's Report on this issue. However, even if the Government's argument were timely, the court does not agree that this search can be characterized as a search of the area immediately adjacent to the Defendant. It was a search of the house, including the bedroom, that took from five to ten minutes (Trans. at 14).

there was a gun in the closet of his bedroom. *Id.* Although this questioning violated *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the court found that the admission of the gun was harmless error and upheld the defendant's conviction. *Id.* at 694. In doing so, however, the Fourth Circuit refused to apply the emergency exception to *Miranda* to the case, because the Defendant was alone when arrested and there was no danger to the public or to the agents. *Id.* at 693. The *Mobley* case also fails to support an argument for the validity of a protective search on the sole basis that weapons are present.

After careful consideration, the court concludes that the Suwanee police officers' search cannot be justified as a *Buie* protective sweep. Officers Walker and Loper had knowledge that weapons might be in the house.[3] However, they had no reason to believe that any other person was present. As a result, this case is unlike those cases where the Eleventh Circuit has upheld protective searches due to the possible presence of dangerous third persons in the premises. *See, e.g., U.S. v. Tobin,* 923 F.2d 1506, 1513 (11th Cir.1991) (fact that three vehicles were parked in front of house and that defendant had lied about codefendant being in house gave rise to reasonable belief that additional people could be hiding in house), *cert. denied,* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991). Absent any reasonable belief based on "specific and articulable facts" that additional people were in the house posing a threat to the officer's safety, the officers were not justified in conducting a pervasive protective sweep of the house. *See Colbert,* 76 F.3d at 778 (lack of information about whether or not another person is in house cannot provide articulable basis upon which to conduct a protective

sweep); *U.S. v. Hogan,* 38 F.3d 1148, 1150 (10th Cir.1994) (protective sweep improper where officer had no indication that there was any danger from a hidden accomplice).

Finally, in its motion, the Government raises for the first time the argument that the seized evidence should be admitted even if the protective search was illegal, because the weapons would have been inevitably discovered. The Government contends that, because Officer Canupp had interviewed the victim of the burglary before Defendant's arrest, and executed a search warrant the day after the arrest, it was inevitable that the guns would have been discovered.

The Supreme Court briefly explained the reasoning behind the inevitable discovery rule in *Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), when it stated that "if the government can prove that the evidence would have been obtained inevitably ... regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." Furthermore, the Supreme Court stated that the Government must establish the inevitability of the lawful discovery by a preponderance of the evidence. *Id.* at 444, 104 S.Ct. 2501.

The Eleventh Circuit applies a two-part standard to determine whether a showing of inevitable discovery has been made:

> To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct.

*United States v. Satterfield,* 743 F.2d 827, 846 (1984) (emphasis in original) (citing *United States v. Brookins,* 614 F.2d 1037

---

**3.** Based on responses during voir dire which the court over time has received, it would be safe to say that there are firearms in well more than half of the homes in the Northern District of Georgia. Based on their own experience, police could reasonably say in every case that weapons are probably present.

(5th Cir.1980)).[4] The Circuit adopted this rule in order to avoid the undermining of the exclusionary rule, because in most illegal search instances, the Government could have obtained a legal search warrant if it had waited. *Satterfield,* 743 F.2d at 846.

In *Satterfield,* after arresting the defendant for murder in his bedroom and taking him outside, the police reentered the house without a warrant and searched for the shotgun used in the crime. *Id.* at 843. The Eleventh Circuit, noting that the police knew that no one was in the house, found that the search and seizure of the shotgun violated the defendant's Fourth Amendment rights. *Id.* at 843–44. The Government then contended that it would have discovered the gun inevitably because the police obtained a search warrant for the house several hours after the illegal search was made. *Id.* at 845. The Eleventh Circuit rejected this argument, stating that "at the time the Government violated [defendant's] fourth amendment right, it did not possess the legal means that would have led to the discovery of the shotgun." *Id.* at 846. In contrast, in *Nix,* the police had begun a 200–person volunteer search for a murder victim's body and had closed to within two and a half miles of the body. *Nix,* 467 U.S. at 449; *United States v. Hernandez–Cano,* 808 F.2d 779, 783 (11th Cir.), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3194, 96 L.Ed.2d 682 (1987). While this search was ongoing, the police conducted an illegal interrogation of the defendant that led to a confession. In light of the ongoing search, the Supreme Court found that police discovery of the body was inevitable. *Nix,* 467 U.S. at 449–50, 104 S.Ct. 2501; *Hernandez–Cano,* 808 F.2d at 783.

In the present case, at the time that the Suwanee police officers illegally searched Defendant's house, the police were not pursuing and did not have a legal search warrant to search the house. Although Officer Canupp procured a search warrant the following day to search for additional stolen items, in his application for that warrant he referred to the seized weapons and other observations he had made while illegally in Defendant's bedroom. As a result, it cannot be said that, absent the illegal search at the time of arrest, the police would have inevitably discovered the weapons the following day through legal means. Instead, the search warrant that was obtained the following day was tainted by the prior illegal search.

## III. CONCLUSION

Defendant's motion to suppress [9–1] is GRANTED.

---

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.